**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Orlando VASQUEZ, Carlos Sanchez, Fernando Eugenio Medina, Amparo Valencia Medina, Clara Inez Mesa and Hernando Mesa, Defendants-Appellants.**

Nos. 1439, 1454, 1457, 1458, 1460, 1461, Dockets 80–1168, 80–1169, 80–1170, 80–1171, 80–1183 and 80–1184.

United States Court of Appeals, Second Circuit.

Argued Aug. 21, 1980.

Decided Dec. 29, 1980.

Domenick J. Porco, New York City (Martin L. Schmukler, Barry Asness, and Diller, Schmukler & Asness, New York City, on briefs), for defendants-appellants Vasquez and Sanchez.

Samuel H. Dawson, New York City (Dawson, Kimelman & Clayman and Paul G. Lieber, New York City, on brief), for defendants-appellants Fernando Medina and Amparo Medina.

Richard I. Rosenkranz, Brooklyn, N. Y., for defendant-appellant Clara Mesa.

Martin Jay Siegel, New York City, for defendant-appellant Hernando Mesa.

Laurence A. Urgenson, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. New York and Mary McGowan Davis, Asst. U. S. Atty., Brooklyn, N. Y., on brief), for plaintiff-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and DUMBAULD, District Judge.*

* Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

KEARSE, Circuit Judge:

These are appeals from judgments of conviction entered in the United States District Court for the Eastern District of New York, Henry Bramwell, Judge. Defendants-appellants Carlos Sanchez, Fernando Medina, Amparo Medina, Clara Mesa and Hernando Mesa pleaded guilty to charges of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976).[1] Their pleas of guilty were entered pursuant to a court-approved agreement preserving their right to appeal certain decisions to this Court. Defendant-appellant Orlando Vasquez was convicted after a jury trial of possession of cocaine with intent to distribute it and conspiracy to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

On their appeals from the convictions, the defendants contend principally that certain arrests, searches and seizures violated their rights under the Fourth Amendment and that evidence derived therefrom should have been suppressed. In addition, Vasquez contends that the evidence against him was insufficient for a conviction; Vasquez and Hernando Mesa contend that they were sentenced in an illegal manner; and Hernando Mesa contends that Judge Bramwell should have recused himself. For the reasons set forth below, we affirm the convictions of Vasquez, Sanchez, Hernando and Clara Mesa, and Fernando Medina, but vacate the conviction of Amparo Medina and the sentence of Vasquez and remand for further proceedings.

I

The case arises out of investigations by members of the New York Drug Enforcement Task Force ("Task Force") which came to a head on the evening of November 29, 1979, when each of the defendants was arrested. The first to be arrested were Hernando Mesa ("Hernando") and his sister Clara Mesa ("Clara"), who had just come from a building at 633 Grand Street in Brooklyn, and from whose car the officers seized a package containing approximately one-half pound of cocaine and a photograph of four of the six defendants. Within the hour, other Task Force members in Queens arrested Fernando Medina ("Fernando") whose wife Amparo Medina ("Amparo") had shortly before left 633 Grand Street; from his car the officers seized a bag containing approximately one pound of cocaine. Fernando was then taken to his home, where Amparo was arrested, the Medina home was searched, and a handgun and various papers were seized. Shortly after the arrest of Fernando, Task Force members still in Brooklyn arrested Sanchez, who had just left 633 Grand Street, and seized from him a bag containing a pound of cocaine. Later, Task Force members arrested Vasquez as he was leaving that address, and conducted a search of the apartment Vasquez was believed to occupy; there they seized, *inter alia*, more than a pound of cocaine, as well as scales, plastic bags and other paraphernalia associated with the processing of narcotics for distribution.

A. *The Suppression Hearing*

All of the appellants moved to suppress the items seized on November 29; the Medinas also sought suppression of statements made by them in the course of the evening. The district court conducted some seven days of hearings on the motions. The government called as witnesses seven members of the Task Force: Marvin Siegel and Robert Palombo, Special Agents of the United States Drug Enforcement Agency ("DEA"); and Luis Ramos, William J. Frawley, John Heckmann, Patrick Skelly, and Vincent Palazzotto, officers of the New York Police Department assigned to the Task Force. Vasquez called two witnesses: Task Force member Anthony Jacaruso, and Dora Wright, the owner of the building at 633 Grand Street. None of the defendants testified. The following description is based on the testimony of the government's witnesses, unless otherwise indicated.

1. These defendants were also charged with conspiracy to distribute cocaine and to possess cocaine with intent to distribute it. The guilty pleas were taken in satisfaction of these charges as well.

The events leading to the November 29, 1979, arrests had their genesis in March 1979 when members of the Task Force searched the apartment of suspected cocaine dealer Rubin Dario Valencia and seized a pound of cocaine, together with documents thought to be records of Valencia's narcotics operation. Among these documents were a customer list identifying "Amparo" as a purchaser of substantial amounts of cocaine and an address book listing Amparo's address and telephone number. Task Force agents therefore concluded that Amparo Medina, whom they later learned was Valencia's sister, was one of Valencia's major customers, and they began to monitor her activities.

As part of the ensuing investigation, on November 14, 1979, DEA agent Palombo was conducting a surveillance of an apartment building at 35–50 81st Street, Queens, known to be the residence of Eugenio Hurtado. At approximately 10:50 p. m. he observed Amparo and Fernando arrive at the intersection of 81st Street and 37th Avenue in a blue Chevrolet. Amparo parked, and Fernando got out and made a call from a telephone booth at the next corner; he then returned to the vehicle, and the Medinas proceeded to square the four-block area bounded by 80th and 83rd Streets, stopping to park at the corner of 80th Street and 35th Avenue. A few moments later Palombo saw Eugenio Hurtado, then empty-handed, enter the Medina vehicle, which proceeded back to Hurtado's building, where Hurtado got out and entered his building, carrying a white paper bag.

1. *Afternoon and Early Evening Observations on November 29*

On November 29, 1979 a team of Task Force agents established a surveillance at the Medinas' residence at 53–20 195th Street, Queens. At approximately 5:00 p. m. Amparo and a man later identified as Vasquez entered the Medinas' blue Chevrolet and proceeded first to Baxter Street, and then to the vicinity of 82nd Street and 37th Avenue, where they parked the car and went into a shoe store. When they left the shoe store they were followed by some

of the Task Force members to Brooklyn, where at approximately 6:30 p. m. Frawley saw them enter the building at 633 Grand Street. This four-story building, which housed a store on the ground floor and one apartment on each of the other three floors, had not theretofore figured in Task Force investigations.

At approximately 6:45 p. m. Siegel observed Vasquez and Essau Correa enter the building together. At about 7:10, Amparo exited 633 Grand Street carrying a large handbag, got into her car and drove away. Jacaruso attempted unsuccessfully to follow Amparo, who was next seen, by other Task Force members, entering her home at approximately 7:35.

2. *The Arrest of the Mesas*

After Amparo left 633 Grand Street, Siegel and Heckmann remained and continued surveillance of the building from some 75–100 feet away. Heckmann observed that lights were visible only on the fourth floor. At approximately 8:00 p. m. Siegel and Heckmann saw the Mesas, whom they had never seen before, exit 633 Grand Street and enter a car parked in front of the building. After the Mesas got into their car the inside dome light was turned on, and they appeared to examine something inside the car for several minutes. The dome light was then turned off and the automobile was driven several blocks, with Siegel and Heckmann following some distance behind in Siegel's car. In those few blocks the Mesas' car, unimpeded by any traffic, stopped in mid-block at least three times for no apparent reason. Siegel considered such stops and starts a possible counter-surveillance effort, and during one of the pauses Heckmann saw Clara, the driver, look into the rear view mirror. Heckmann determined that their surveillance had been detected and the agents decided to stop the Mesas and interrogate them.

Immediately thereafter, when the Mesa car stopped behind another vehicle at a red light, Siegel stopped his car directly behind the Mesas' car and he and Heckmann got out and approached the Mesas' car. At

first Siegel did not have his gun drawn, and Heckmann had his gun in his right hand at his side. As Heckmann reached the front bumper of the agents' car, he saw Hernando open the passenger door of the Mesa car and, looking back at Heckmann, start to place a package under the car. As Heckmann hastened forward with shield and gun in hand, Hernando pulled the carton back into the car, closed and locked the door, and placed the carton under the front seat. Heckmann and Siegel identified themselves and asked the Mesas to get out of the car.

Hernando continued to reach under the front seat, a position in which he remained for some 30–45 seconds while he talked to Clara, before complying with the officers' order. Based on his experience with prior narcotics investigations, Heckmann believed that Hernando might well have been armed and that he was groping for a gun. Accordingly, when Hernando finally stepped out of the car, Heckmann immediately reached under the seat. He removed an object which turned out to be half a Marlboro carton, containing a plastic bag with white powder that was eventually determined to be more than one-half pound of cocaine. After the package was seized, Hernando continued to resist the officers and was handcuffed. He and Clara were arrested and taken to a local police precinct. Siegel promptly radioed word to Task Force members in Queens of the Mesas' arrest and the seizure.

At the time of the Mesas' arrest, Siegel searched Clara's pocketbook and removed an address book and some papers. During a subsequent inventory search of the Mesas' car Heckmann seized a group photograph showing Hernando Mesa, Fernando Medina, Amparo Medina, Vasquez and Essau Correa seated around a table.

### 3. The Arrest of Fernando Medina

Shortly after Amparo returned home from 633 Grand Street, Frawley observed Fernando leave the Medina house carrying a yellow plastic bag and enter the blue Chevrolet. A few minutes later, Palombo and Skelly observed Fernando park the car on 81st Street near 37th Avenue and walk to 35–50 81st Street, the building in which Eugenio Hurtado lived. When Fernando entered the building, Palombo and Skelly approached him and asked him to identify himself. Skelly displayed his shield; neither officer drew his gun.

Fernando recognized Palombo,[2] and said "Hi, how are you doing," and gave his name. When asked what he was doing there, Fernando responded that he was there to "ring a bell," but could not remember whom he was there to see. The officers asked Fernando how he had arrived at that location. Fernando said that he had come by car, and when the agents asked whether they could look inside the vehicle, Fernando replied "Yes," and handed his car keys to Skelly.[3] Palombo and Skelly then accompanied Fernando to the car, where Skelly found under the front seat a yellow plastic bag, rolled into a tube some three inches in diameter, the contents of which felt soft and lumpy. Fernando was asked what was in the bag, and he answered, "Shoes." Skelly opened the bag and found in it a clear plastic bag containing white powder, which was ultimately determined to be nearly one pound of cocaine. Fernando was placed under arrest.

Palombo informed Siegel and Heckmann, who were still near 633 Grand Street, that Fernando had been arrested and that a seizure had been made.

### 4. The Arrest of Amparo and the Search of the Medinas' House

After Fernando was arrested, Detectives Ramos and Frawley arrived, and Ramos

---

**2.** Fernando had met Palombo in April 1979 in the office of an Assistant United States Attorney, where Fernando had acted as an interpreter for his brother-in-law Rubin Dario Valencia.

**3.** In direct examination Skelly testified that Medina replied "Yes" when asked whether the agents could look inside his vehicle, and hand-

ed him the keys. On cross-examination, Skelly merely recalled that Medina started walking toward his vehicle and gave him the keys. Palombo testified that Medina said "Yes" when asked about a search of his car and gave the keys to Skelly.

read Fernando his constitutional rights in Spanish. After each right was recited to Fernando he responded that he understood.

The agents then told Fernando that they were taking him to his home, where they intended to arrest Amparo for conspiracy. En route to his home, Fernando indicated that he recognized Frawley and Ramos as the officers who had arrested his brother-in-law, Rubin Dario Valencia; he stated that he, Fernando, had gotten involved in cocaine trafficking a few months earlier, after seeing how much money Valencia was making.

While still several blocks from the Medinas' home, Ramos asked Fernando for permission to search his house, stating that if he did not consent, the agents would search it anyway and Fernando and his family would be inconvenienced by having to wait for the agents to get a search warrant. Fernando stated that he would consent to the search on the condition that his handcuffs be removed and he be treated like a gentleman. Frawley decided that the possibility of a consent should be abandoned, but the agents agreed to remove Fernando's handcuffs.

When they arrived at the Medinas' home, Fernando knocked and identified himself. Amparo opened the door, and Fernando and the agents entered. Palombo immediately showed Amparo the yellow bag and stated, "You realize that you are in trouble," to which she replied, "Yes, I know I am in trouble." Palombo then advised Amparo that she was under arrest and read her her constitutional rights. Later, Amparo stated that she had become involved in the narcotics trade because she had been threatened by customers of her brother, who had demanded that she pay his debts.

After Amparo was advised of her constitutional rights, Frawley telephoned an Assistant United States Attorney ("AUSA") to request a search warrant. The AUSA asked if the agents could secure the Medina premises and apply for the warrant the following day. Frawley replied that this was impractical. The AUSA then asked further questions about the probable cause

for the warrant, and several conversations on that subject ensued between the AUSA and Palombo.

Frawley reported to the Medinas that the agents were attempting to get a warrant and would have to remain and secure the apartment. Fernando replied that a warrant was not necessary; he would consent to a search, and he had explained the situation to Amparo, who also would consent. Frawley then drafted and gave to Fernando a consent-to-search form which Fernando read and said he understood. The consent form was read in Spanish to Amparo, who also stated that she understood it, and it was then executed by Fernando and Amparo and witnessed by Ramos and Palombo. At the time the consent was signed, the Medinas were in their kitchen, no weapons had been displayed, and Amparo was drinking coffee or tea.

Palombo and Frawley conducted a search of the residence. Fernando, who accompanied them, directed the officers to a handgun which, together with miscellaneous papers, was seized. Throughout the search, Fernando did not object to any actions by the agents, nor indicate that any of the seizures were beyond the scope of the authorization.

### 5. The Arrest of Sanchez

Meanwhile, after taking the Mesas to a local police precinct, Siegel and Heckmann had resumed surveillance of 633 Grand Street. At approximately 8:45 p. m., shortly after having received word of Fernando Medina's arrest, Siegel observed two individuals, one later identified as Sanchez, enter the building. Both Sanchez and his companion were empty-handed.

Ten or fifteen minutes later, Sanchez left 633 Grand Street carrying a shopping bag. After he had walked approximately a block and turned the corner into Leonard Street, the agents followed in their car, backing it up Leonard Street to reach Sanchez; they then got out and identified themselves, and asked Sanchez what apartment he had come from. Sanchez responded in Spanish, quickly dropped the shopping bag, and be-

gan to fidget while standing directly over it. Each agent placed a hand on one of Sanchez's arms to stop his movement. Heckmann, concerned about the presence of a weapon, looked into the shopping bag and observed a cereal box with one flap of the top open and the other partially closed. He could see three inches into the box and could see that the wax paper lining had been removed. Heckmann ripped open the partially closed flap and discovered a plastic bag containing white powder, ultimately determined to be a pound of cocaine. Sanchez was placed under arrest.

6. *The Arrest of Vasquez and the Search of the Apartment*

After arresting Sanchez, Siegel and Heckmann again resumed surveillance of 633 Grand Street, and observed a woman, later determined to be Dora Wright, the owner of the building, enter with a baby and another woman. Later, Siegel and Heckmann observed that three men, eventually identified as Messrs. Jaramillo, Parra and Uribe, exit 633 Grand Street and look cautiously up and down the block. The three separated upon leaving the building, and then rejoined and began to walk together. When Siegel and Heckmann approached them they again began to separate. The officers stopped the three men and led them around the corner, in order to be out of the sight of anyone remaining in the building. Jaramillo and Parra were asked what apartment they had been in. They replied that they had been visiting a woman in the second floor apartment, but they did not give her name. Siegel asked Jaramillo if he would accompany him to that apartment and Jaramillo agreed.

Leaving Parra and Uribe with other officers, Siegel and Heckmann started back

toward 633 Grand Street with Jaramillo. As they neared the building they saw Essau Correa and Vasquez leave the building. Detective Palazzotto, who had just joined the surveillance team, recognized Vasquez and Correa as reputedly large dealers in cocaine in New York and New Jersey; he had previously arrested them on charges of distributing cocaine. He called to them to halt, but when they recognized him they crossed the street away from him and walked swiftly. Palazzotto and Siegel ran after them and "detained" them.[4] Palazzotto took custody of them.

Siegel returned to Heckmann and Jaramillo and, with several other officers, proceeded to the second floor apartment at 633 Grand Street. Jaramillo knocked at the door of the apartment, and Dora Wright, the landlord, answered in Spanish. Jaramillo spoke in Spanish with Wright and she opened the door. The officers entered, and she told them that Jaramillo had just asked her in Spanish to tell the police that he had been with her earlier, but that this was not so. Wright stated that throughout the day Jaramillo and others had been in and out of the fourth floor apartment, which she had rented to a man named Orlando, for himself, his brother and a friend.

After checking through Wright's apartment to assure themselves that her apartment was not the scene of the narcotics operation—a process that took several minutes and caused much commotion[5]—the agents decided to enter the fourth floor apartment on the ground that additional persons might be there and might now be aware of the agents' activities and would destroy evidence. After learning that the officers intended to enter the fourth floor

---

4. It seems clear that Vasquez's "detention" was an arrest: he was frisked, handcuffed, and kept in custody; at the hearing Palazzotto referred to him from this point on as one of the "prisoners."

5. Varying descriptions of the events at Wright's second-floor apartment have been given by Wright and the agents, but all agree that the scene was at least tumultuous. The agents thought they were at the center of narcotics operations, since this is where Jaramillo said he

had been. Wright, on the other hand, was totally unprepared for an onslaught of several armed strangers. When Wright opened the door in response to Jaramillo, several agents, with guns drawn, immediately entered and fanned out through her apartment, checking each room for other persons. Wright commenced to scream, and from all that appears, she, as well as her mother and her baby, were still screaming 10–15 minutes later.

apartment by climbing the fire escape and possibly breaking a window, Wright gave the officers a key.

Upon entering each room on the fourth floor to check for additional suspects, the officers seized a series of items. From an open foyer closet, the officers took white powdery substances wrapped in clear plastic bags, some of which were inside an open plastic garbage bag and others of which were in an open travelling bag; all were said to be in plain view. In the center bedroom they seized a number of documents from an open box. In the rear bedroom they found, exposed to open view, one pound of cocaine, a triple-beam scale, and a large piece of glass covered with cocaine residue. They also found, in an open box lying in a metal cabinet, sixteen bottles of Mannitol, two strainers, assorted boxes of plastic bags, a set of weights, and a scale. In addition, a pistol was found as Agent Siegel later "absentmindedly reached between the mattress and the box spring" of a bed on which he was sitting.

The agents' security check was completed in just a few minutes. They remained in the apartment for an additional sixteen hours.

**7. The Statement and Testimony of Dora Wright**

Later that evening Wright, accompanied by her brother-in-law, went with Palazzotto to DEA headquarters, where she identified a photograph of Vasquez as the person who rented and lived in the fourth floor apartment, and identified a photograph of Sanchez as the person she knew as "Carlos," Vasquez's brother. Wright gave a written statement which she read, corrected and signed, which said that Vasquez alone had rented the apartment, telling her that it was for the use of himself, his brother and a friend. They had moved in in mid-September. Vasquez always paid the rent in cash and did not want receipts.[6]

At the suppression hearing Wright testified on behalf of Vasquez and substantially recanted her written statement. She stated that a man named Jorge Osorio, and not Vasquez, had rented and lived in the fourth floor apartment. She stated that she had been approached in October 1979 by Vasquez and Osorio concerning rental of the apartment. Wright met with Vasquez and Osorio on three occasions. At the first meeting Osorio gave her a $30 deposit for the apartment; at the second meeting he gave her $550 in payment of the November

---

**6.** Wright's complete statement was as follows:

Dora Wright who resides at 633 Grand Street, Brooklyn, apt. # 1 states that her and her husband Victor Wright own the above mentioned building and that on or about Sept. 1st one male Colombian known to me as Orlando rented apt. # 3 which is located on the top floor of my building at this time Orlando also told me that the apartment would be for him (Orlando) his brother and a friend. On or about the middle of September they moved in.

During the time in which they lived there Orlando would pay the rent in cash and did not want no receipt or did he want to sign any lease. Mrs. Wright also states that from the time in which Orlando moved in until present she noticed several males entering the building and going to the top floor.

On 11/29/79 at approximately 1:30 or 2 P.M. Orlando came to my apartment and paid me the rent but before Orlando paid me the rent I heard my bell ring and I then saw a man pass my door and go to the top floor about ½ hour later that same person rang my bell and went up to the top floor Orlando's

apartment. About 4 P.M. I went out and returned home approx. 9:15 P.M. At approx. 10:40 P.M. I heard a knock on my door and when I open the door I saw the same man who I saw twice earlier that day and other man enter my apartment the other man were police officers. At this time the man who I saw earlier told me in Spanish to tell them that he was just here in my apartment asking me for a cousin of his. I than told him in Spanish that no you were not here and what is going on? Why are all these policeman here? He than told me to please say that I was here and not to worry there was just a misunderstanding.

Det. Palazzotto then told me that the reason why we were here because they arrested people on the street for cocaine and that this man told us that he lived here. I than told Det. Palazzotto no he did not live here but I saw him twice going up the stairs today. I have read this 2 pages and they are true and account to the best of my knowledge.

Dora Wright 11/30/79

Witness Luis Ramos _____

Robert Palombo _____

rent and one month's security; at the third meeting, on November 29th, the day of the arrests, Osorio handed $275 to Vasquez for the December rent, which Vasquez then handed to Wright.[7]

## B. *The District Court's Decision*

The district court denied the motions of the Mesas, Fernando Medina and Sanchez, and granted in part and denied in part the motions of Amparo Medina and Vasquez. Preliminarily, the court observed that the documents seized from Rubin Dario Valencia's apartment in March 1979 had given rise to reasonable suspicion about the activities of Amparo Medina and that the activities of Amparo and Fernando Medina at Hurtado's apartment on November 14, 1979, had "contributed to the building of reasonable suspicions" concerning their activities.

As to the Mesas, the court found that when they left 633 Grand Street, where Amparo Medina had been seen, they drove erratically, as Clara checked to see if they were being followed. The court found that these activities were suspicious since the Mesas had left a "suspected drug source locale," and concluded that the investigative stop of the Mesas' car was supported by reasonable suspicion; Hernando Mesa's actions as the officers approached them then gave rise to probable cause to arrest both Hernando and Clara. The motion to suppress the cigarette carton and its contents, as well as other items seized from the car and from Clara's person, was denied.

The district court found that the agents' approach to Fernando Medina and their interrogation of him were supported by their knowledge of his connection with a suspected drug trafficker and by the timing of his visit to Hurtado's apartment, a location where he had previously engaged in suspicious activity. The court found that Fernando voluntarily consented to the search of his automobile, and that the seizure from the car of the plastic bag of white powder was lawful and provided probable cause for

his arrest. The motion to suppress Fernando's post-arrest statements was denied on the ground that they were given after *Miranda* warnings were administered and he had been made aware of his rights. Finally, Judge Bramwell concluded that Fernando Medina consented to the search conducted at his residence and that the seizures there were lawful.

With respect to Amparo Medina, her statements before she was advised of her rights were suppressed; those made afterwards were held admissible.

As to Sanchez, the court found that he had entered 633 Grand Street, a suspected drug locale, empty-handed and left fifteen minutes later carrying a plastic bag, the "common container of the drug industry." These facts, together with Sanchez's nervousness, his dropping of the bag, and the prior events at 633 Grand Street, gave the agents probable cause for his arrest. The court found that the search of Sanchez's bag was incident to his lawful arrest and that the contents were admissible against him.

Turning finally to the search of the fourth floor apartment, the court found that the observations of the officers and the seizures of large amounts of cocaine, gave them reason to believe that illegal activities were being conducted on the upper floors of 633 Grand Street. In addition, Wright had advised them that people had been going in and out of that apartment all day. Accordingly, the officers "could understandably believe that additional evidence was present in the apartment which was capable of being destroyed," and the court found that in light of the time constraints, "their decision not to delay for the purpose of obtaining a search warrant was justified." The court added, however, that "once the officers entered the apartment and made a cursory examination to determine whether any persons were present their activities should have ceased." The court, therefore, held that only those items observed in plain view

---

**7.** Vasquez introduced into evidence two utility company bills addressed to Jorge Osorio at 633 Grand Street.

during the initial cursory inspection were admissible. The court suppressed as the fruits of a "thorough search" the items seized from an open box inside a metal cabinet, documents seized after the initial entry, and the gun found under the mattress.

## C. The Trial of Vasquez

Following the district court's rulings on the motions to suppress, all of the defendants except Vasquez entered pleas of guilty to charges of possession of cocaine with intent to distribute. Vasquez proceeded to trial on charges of possession of cocaine with intent to distribute and conspiracy to possess and distribute cocaine.

At trial the government offered testimony as to the surveillances and seizures as presented at the suppression hearing. The approximately 2½ pounds of cocaine seized from the Mesas, Sanchez, and Fernando Medina, were introduced; in addition, one pound of cocaine, a triple-beam scale, a large glass plate, and quantities of diluent, all seized from the 633 Grand Street apartment were introduced.

Wright was called by the government and treated as a hostile witness. Although she confirmed that Vasquez was present every time the rent was paid, including the day of the arrests, she claimed that it was really Jorge Osorio who had rented the fourth floor apartment. Wright testified that she had told Palazzotto about Osorio but he refused to include this information in her statement; she stated that Detective Palazzotto had drafted her written statement as he wished and had forced her to sign it. Later, she testified that at approximately 3:00 p. m. on November 29, 1980, more than three hours before the agents even became aware of 633 Grand Street, Osorio had called and warned her not to mention his name to the police, and that that call had caused her not to mention Osorio to Palazzotto and to implicate Vasquez instead. She added that one week after the arrests she had received a small notebook informing her that she was being watched and that she should "leave things the way they are." Wright testified that she had burned the notebook.

The defense called three witnesses. DEA Agent Palombo testified that no keys were found in Vasquez's possession during a search conducted two hours after his arrest. Police Officer Phillip Lynch, a fingerprint expert, testified that a fingerprint found on the glass sheet seized from 633 Grand Street did not belong to Vasquez. Finally, Detective Ramos testified that he had prepared a report concerning his post-arrest interview with Vasquez and had asked Vasquez his address. The defense for tactical reasons apparently unrelated to Vasquez's answer to this question, curtailed examination of Ramos without eliciting Vasquez's response as to his address.

The jury convicted Vasquez on both counts.

## D. The Sentences of Vasquez and Hernando Mesa

Vasquez was sentenced to two consecutive prison terms of fifteen years each and to a special parole term of ten years. Hernando Mesa, who had been freed on parole from a previous conviction just four weeks before his November 29 arrest, was sentenced to a fifteen year prison term and a special parole term of ten years; his sentence was to be consecutive to any term imposed for violating parole.

These appeals followed.

## II

We turn first to the claims of the Mesas and Sanchez that their Fourth Amendment rights were violated because they were arrested without probable cause, and that the evidence seized from them therefore should have been suppressed. The government argues that the Mesas and Sanchez were not initially arrested, but rather were lawfully stopped for investigative purposes, and that events during these investigative stops provided the officers with probable cause to arrest them. We agree.

## A. *The Mesas*

■ It is a given that an arrest may not lawfully be effected without probable cause, that is, without evidence that would give a man of reasonable caution grounds to believe that a crime has been committed by the person arrested. *E. g., Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963). Law enforcement officers may, of course, briefly stop a person without arresting him; to the extent, however, that the stop has the effect of restraining the individual's freedom to walk away, the Fourth Amendment requires that the stop be reasonable. *E. g., Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *see Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Whether or not this standard of reasonableness is met depends principally on two factors: the basis for the stop and the degree to which the stop restrains the individual.

■ As to the first element, a detention does not comply with the Fourth Amendment unless the officers were "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the individual was engaged in criminal activity. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). While this standard is less stringent than probable cause, it too is "an objective standard." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *see Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam) ("reasonable and articuable suspension"); *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640 ("specific, objective facts"). In determining whether an officer's suspicion was reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. Obviously under such an objective standard, investigatory stops cannot be made completely at random, *Delaware v. Prouse, supra,* or at the "unfettered discretion of officers in the field." *Brown v. Texas, supra,* 443 U.S. at 51, 99 S.Ct. at 2640.

■ The second factor in evaluating the reasonableness of a detention is the degree of intrusion into the individual's freedom. The greater the intrusion, the stronger the basis for the officers' action must be. In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), for example, the police took a suspect from his home to the police station and kept him there for questioning. While the suspect was not technically under arrest, neither was he free to leave. The Court held this detention too intrusive to be justifiable on the basis of mere reasonable suspicion. The suspect's liberty was sufficiently curtailed that, in order to be reasonable under the Fourth Amendment, probable cause was required. *Id.* at 216, 99 S.Ct. at 2258. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). In general, if probable cause is lacking, the intrusion must be no greater than the circumstances require. Thus, a police officer who has reason to believe that he is dealing with an armed and dangerous individual may, for his own protection or that of passersby, make a reasonable search for weapons, even if he does not have probable cause to arrest the individual for a crime. *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. On the other hand, an officer who has lawfully stopped an individual reasonably suspected of criminal activity may not "frisk" that individual if he has no articulable grounds for fearing danger. *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968):

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he

must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. And if a weapon is feared, a "pat down" may suffice, and make unreasonable an actual search of the individual's pockets. *Id.* at 65, 88 S.Ct. at 1904.

These rules apply no less to individuals in automobiles than to pedestrians. *See Delaware v. Prouse, supra; United States v. Brignoni-Ponce, supra.* Thus in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court upheld the actions of an officer who, without drawing his gun, approached a car at 2:15 a. m. and immediately seized a gun from the waistband of the driver; the officer had been alerted by an informant that the driver possessed narcotics and carried a gun in his waistband. "Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude it was reasonable." *Id.* at 148, 92 S.Ct. at 1924. Most recently, this Court has upheld a protective search after officers in a moving vehicle pulled alongside the defendant's car, displayed a badge, and ordered the defendant's car to the curb. *United States v. Manuel Vasquez,* 634 F.2d 41 (2d Cir. 1980). *See also Pennsylvania v. Mimms,* 434 U.S. 106, 112, 98 S.Ct. 330, 334, 54 L.Ed.2d 331 (1977) (per curiam) (frisk upheld by officer who stopped automobile for traffic violation and noticed bulge in driver's jacket). And *see United States v. Diggs,* 522 F.2d 1310, 1314 (D.C.Cir.1975), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976), in which officers, investigating an armed robbery that had occurred just hours before, approached a car with their guns drawn and ordered the occupants to raise their hands. The majority opinion apparently treated this as merely a forcible stop, and found it justified by "powerful suspicion" that the occupants had just participated in the robbery. In several cases, officers' approaches to automobiles have been held to be so intrusive as to constitute or be tantamount to arrests, for which probable cause is required. For example, where nine officers, even without drawing their guns, ordered a taxi off the road and surrounded the passengers, the show of force was deemed unreasonably intrusive. *United States v. Beck,* 598 F.2d 497 (9th Cir. 1979); *see Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959) (government conceded, and Court agreed, that arrest took place when agents waved car to a stop; no indication that agents drew guns); *United States ex rel. Walls v. Mancusi,* 406 F.2d 505, 508–09 (2d Cir.), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969) (arrest occurred when officer ordered suspect out of parked truck at gunpoint); *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir. 1974) (car surrounded by officers issuing orders at gunpoint); *United States v. Ramos-Zaragosa,* 516 F.2d 141 (9th Cir. 1975) (order to stop car, made at gunpoint while car in motion, held an arrest). Obviously, each case must be judged with particular reference to its own facts. *See Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).

■ The Mesas' case raises close questions as to both the reasonableness of the grounds for making an investigatory stop and the degree of intrusiveness. We believe, however, that on the whole, despite the fact that Mesas had not theretofore been the focus of Task Force attention, each action taken by officers Siegel and Heckmann was reasonable in light of what had gone before. First, Amparo Medina, whom the Task Force had excellent reason to believe was a distributor of narcotics, had left 633 Grand Street at 7:10 p. m. The building was under virtually constant surveillance from the time of Amparo's arrival until the Mesas were taken to the nearby police precinct. Neither Siegel nor Heckmann had seen the Mesas enter; therefore they could infer that the Mesas had been in the building before Amparo arrived and were there during her 40-minute stay. The fact that lights were, and had been, visible only on the fourth floor of the building made it more likely than not that all

present in the building were on the fourth floor. Thus, there were articulable grounds for placing the Mesas in the company of a strongly suspected drug dealer. When the Mesas emerged and entered their car, their behavior was suggestively erratic. First, it appeared that they spent several minutes examining something they had brought with them from 633 Grand Street. Then they drove off in fits and starts for no traffic-related reasons, glancing in the mirror to check for surveillance. *See, e. g., United States v. Manuel Vasquez, supra* (traffic maneuvers indicating surveillance had been detected contributed to reasonable ground for suspicion); *accord: United States v. Maria Vasquez,* 612 F.2d 1338, 1342 (2d Cir. 1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States v. Price,* 599 F.2d 494, 500 (2d Cir. 1979). These facts provided an adequate basis for the district court's conclusion that the officers who stopped the Mesas' car were "justified in having reasonable suspicions" about the Mesas' activities, and that an investigatory stop was therefore not unlawful.

■ Nor was the conduct of the officers of such intrusiveness as to require the district court to find it unreasonable on the basis of the information they then possessed. They did not crowd the Mesas' car off the road, or pull alongside while the car was moving and order them to stop. Instead they waited until the Mesas' car had stopped behind another vehicle at a traffic light, and stopped their car directly behind the Mesas' car. When the officers got out of their car, Siegel did not have his gun drawn and he did not draw it until a few moments later when he saw Heckmann bolt forward with a show of urgency; Heckmann did have his gun in hand when he got out of Siegel's car, but he had it at his side, not outstretched or otherwise in evidence. Before the officers could get past the front of their own car to pose any questions to the Mesas, Hernando Mesa had opened his car door, started to place a package under

the car, looked back at Heckmann and pulled the carton back in, closing and locking his door. The officers were now at the doors to the Mesa car, with their guns and badges displayed, ordering the Mesas to open their doors and get out. Hernando ignored these orders for 30–45 seconds while he groped around under the seat and talked to Clara.

■ We agree with the implication of the district court's decision that the arrest did not occur before the officers leveled their guns at the Mesas and ordered them out of their car. By that time, Hernando's actions with his package had suggested a consciousness of wrongdoing, which, when added to the existing information, had given the officers probable cause to arrest the Mesas. *See, e. g., Sibron v. New York, supra* (flight at the sight of an armed off-duty officer); *United States v. Gomez,* 633 F.2d 999, 1006 (2d Cir. 1980) (hastening to enter apartment and slamming door when DEA agents announced their authority); *United States v. Cisneros,* 448 F.2d 298, 302 (9th Cir. 1971) (slamming door on a known law officer); *United States ex rel. Gary v. Follette,* 418 F.2d 609, 611 (2d Cir. 1969), *cert. denied,* 397 U.S. 1015, 90 S.Ct. 1250, 25 L.Ed.2d 429 (1970) (attempting to close trunk of car at sight of police); *United States ex rel. Cunningham v. Follette,* 397 F.2d 143, 145 (2d Cir. 1968), *cert. denied,* 393 U.S. 1058, 89 S.Ct. 699, 21 L.Ed.2d 699 (1969) (stashing brown paper bag in handbag at the approach of plainclothesmen); *United States v. Soyka,* 394 F.2d 443, 453–54 (2d Cir. 1968) (en banc), *cert. denied,* 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969) (jumping back into apartment at sight of plainclothesmen). We conclude, therefore, that the arrest of the Mesas was lawful. The search of the Mesas' car also was lawful because Hernando's actions had given the officers probable cause to believe the car contained evidence of a crime. *Chambers v. Maroney,* 399 U.S. 42, 47, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970), *United States v. Dien,* 609 F.2d 1038 (2d Cir. 1979).

We conclude, therefore, that the Mesas' motion to suppress was properly denied, and their convictions are affirmed.[8]

### B. *Sanchez*

■ The legal principles that govern the Mesas' claim are also applicable to Sanchez's situation. Even before the officers approached Sanchez to effect a stop, their observations gave them cause to be at least highly suspicious that he was carrying narcotics. They had reason to believe that the fourth floor apartment at 633 Grand Street was being used for the distribution of narcotics. Before Sanchez first appeared outside that address, the Mesas and Fernando Medina had been arrested in possession of cocaine—the Mesas immediately after leaving 633 Grand Street, and Fernando shortly after his wife had arrived home from that address. Sanchez was then observed entering 633 Grand Street empty-handed and leaving ten minutes later with a shopping bag. Lights were apparently still visible only on the fourth floor. The strength of the inference that Sanchez had visited the fourth floor apartment and obtained narcotics there very nearly, if not actually, established probable cause to arrest him for possession of narcotics. Unlike the defendant in *Henry v. United States, supra*, who picked up cartons in the neighborhood where a theft had occurred, Sanchez appeared to have obtained his recently acquired package from the precise apartment where drugs were being distributed.

■ In any event, the officers' suspicions fully justified an investigatory stop.

*Terry v. Ohio, supra.* Their suspicions were not reasonably enhanced by the additional fact that Sanchez nervously backed away when approached by two men in plain clothes who backed their car up the street and hopped out to approach him. However, the officers were entitled to assess the significance of the events that followed. When the officers, neither of whom had drawn his gun, identified themselves to Sanchez and asked him from what apartment he had come, Sanchez responded in Spanish, which neither officer understood, dropped or placed his shopping bag on the ground at his feet, and began to "fidget." His fidgeting may have been some cause for alarm, and it was reasonable, in light of these movements, for each officer, in effecting a *Terry* stop, to place a restraining hand on one of Sanchez's arms and for Heckmann to look into the shopping bag to check for a weapon; this minimum amount of restraint in response to Sanchez's movements was not unduly intrusive in the circumstances. *See United States v. Beck, supra*, 598 F.2d at 501 (use of force without probable cause to arrest permissible if "precipitated by the conduct of the individual being detained").

■ Heckmann's look into the bag enabled him to see that it contained a cereal box with one flap of the top open and one flap closed. Prior to opening the closed flap, he could see three inches inside the box. This view enabled him to notice that the cereal box did not have the customary inside lining of waxed paper or any similar material. He then reasonably inferred that

---

8. Hernando Mesa presses two additional arguments. First, he asserts that Judge Bramwell should have recused himself from Hernando's case because Hernando had previously been convicted of possession of cocaine before him. This contention is meritless. The mere fact that a judge presided over prior proceedings in the same or a related case is not grounds for disqualification. *See United States v. Wolfson*, 558 F.2d 59, 64 (2d Cir. 1977); *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976).

Second, Hernando contends that his sentence of fifteen years was disproportionately harsh. While his sentence was the second-longest im-

posed in this case, it was within the statutory limits. It is thus not subject to review since there is no proof that it was based on improper considerations or incorrect information, *see, e. g., United States v. Tramunti*, 513 F.2d 1087 (2d Cir.), *cert. denied*, 423 U.S. 823, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and does not appear to be "so manifest an abuse of discretion as to violate traditional concepts." *United States v. Holder*, 412 F.2d 212, 214–15 (2d Cir. 1969).

Finally, we note that Hernando has not raised, and we therefore do not reach, the question of whether his sentence could properly be made consecutive to the yet-to-be-imposed term for violation of his parole.

the box he was observing was not being used to carry its original contents of cereal. At that point, his prior strong suspicion that Sanchez was carrying narcotics somewhere in the bag ripened into probable cause to arrest Sanchez, and he was therefore entitled to make a search of items within " 'grabbing distance' " even though an arrest followed rather than preceded the search. *United States v. Riggs*, 474 F.2d 699, 704 (2d Cir. 1973).[9] This search, incident to the arrest that was lawfully about to be made, properly extended to the contents of the bag, none of which, including the cereal box, was a sealed container entitled to special protection. *See Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980). Sanchez's motion to suppress the contents of the box was properly denied, and his conviction is affirmed.

### III

The claims of Fernando Medina center not on whether the initial approach to him by officers Skelly and Palombo was reasonable, but on whether the ensuing searches of Fernando's car and his house were permissible on the basis of his consent, and whether his statements following his arrest were voluntary. We find all of his arguments unavailing.

#### A. *Consent to Search Car*

■ The principles governing consent searches were recently summarized by this Court in *United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980). A search conducted without a warrant may be justifiable if it has been voluntarily consented to by a person lawfully in control of the property searched. Such a voluntary consent is deemed to make the search "reasonable" for purposes of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218,

219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The government has the burden of proving that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). In assessing whether the government has met its burden no one fact is determinative; the existence of consent must be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte, supra*, 412 U.S. at 226–27, 93 S.Ct. at 2047.

■ The fact that a person is in police custody does not indicate that a consent to search was not given voluntarily if he was able to exercise a free choice. *See United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Freedom of choice is deemed non-existent, however, if the officers have claimed official authority to conduct the search. *See Bumper v. North Carolina, supra*. And if the individual has merely acquiesced in a show of authority, he should not be found to have consented. *United States v. Sanchez, supra; United States v. Ruiz-Estrella*, 481 F.2d 723, 728 (2d Cir. 1973); *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973).

■ Application of these principles to the search of Medina's car presents no particular difficulty. Palombo, whom Fernando had met before and recognized, and Skelly approached Fernando in the vestibule of the apartment building where Hurtado lived. No guns were drawn, and Fernando was not frisked or ordered to raise his hands. While he undoubtedly was not free to leave, he was not then placed under arrest, and there is no evidence that he was threatened in any way. When the agents asked for permission to search his car, Fernando handed them his keys. The district court did not err in concluding that the government met its burden of showing that this consent was obtained voluntarily.

---

**9.** Although the agent testified that he searched the box because he suspected it might contain a weapon, he was justified in doing so by his additional belief, now reenforced, that Sanchez had left 633 Grand Street carrying narcotics, which could have been anywhere in the bag.

■ Thus, the search of Fernando's car was lawful. After one of the officers found white powder in the yellow plastic bag in Fernando's car, Fernando having been seen leaving his house minutes earlier with a yellow bag, there was probable cause to arrest him. *See, e. g., United States v. Santana,* 485 F.2d 365 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). We therefore conclude that Fernando's arrest also was lawful.

## B. *Voluntariness of Statements*

■ After his arrest, Fernando Medina made a number of statements to agents Frawley and Ramos as to when and why he entered the narcotics trade. Fernando moved to suppress these statements on the ground that he did not knowingly and intelligently waive his Fifth Amendment rights. We find no error in the district court's finding that Fernando adequately understood his rights.

Following Fernando's arrest, Detective Ramos read Fernando the *Miranda* warnings in Spanish. After each right was read Ramos asked, "Do you understand?", and Fernando replied, "yes, I understand", or "I understand" to each question. Fernando argues that this "mechanical recitation of a phrase" cannot constitute a knowing and intelligent waiver. He also points to Ramos's testimony on cross-examination that Fernando replied "I understand" to Ramos's question "Do you waive your rights?", and argues that this non-responsive answer indicates that Fernando made no knowing and intelligent waiver. This argument is unpersuasive. Fernando's repetition of "yes, I understand" or "I understand" was hardly an abnormal response to Ramos's repeated question "Do you understand?" As to the argument that Fernando's answer to the question "Do you waive your rights?" was non-responsive, Ramos testified on direct examination that Fernando's answers were responsive. Nothing in the circumstances indicates that Fernando did not wish to waive his rights. He had already voluntarily consented to a search of his car and had been caught red-handed with a large quantity of cocaine. At no point did he ask for an attorney or express a desire that the questioning cease. We note that he was not a stranger to investigative confrontations, having acted as an interpreter for his brother-in-law, Rubin Dario Valencia on at least one occasion in the office of an Assistant United States Attorney. The district court's finding that Fernando was made aware of his constitutional rights is not clearly erroneous, and the motion to suppress these statements was properly denied.

## C. *Consent to Search House*

■ We find the merits of the contention that there was no voluntary consent to the search of the Medinas' home a more troublesome issue. *See* Part IV *infra.* However, in light of our rulings as to the admissibility of the cocaine and the post-arrest statements, we conclude that even a finding favorable to Fernando on the question of consent to search his house would not suffice to overturn his conviction. The items seized as a result of the latter search were a gun and a few documents.[10] No narcotics were found. Fernando was not indicted on a weapons charge; he was indicted only for possession of cocaine with intent to distribute it and for conspiracy to possess and distribute cocaine. On the charge of possession, to which he pleaded guilty in satisfaction of both counts, the evidence against him—the cocaine found in his car and his later statements—was overwhelming. The effect of the gun and the documents would, at worst, have been *de minimis.* Fernando's conviction is affirmed.

## IV

Amparo Medina contends that her Fourth Amendment rights have been violated because she was arrested without probable cause and without a warrant, and because the warrantless search of her home was

---

**10.** The documents seized consisted of a newspaper clipping, three money orders in the name of Ruben Dario Aquedalo, a telephone book, a memorandum in Spanish signed by Blanco Amparo Valenica, and a bill of sale for a 1980 Corvette.

unlawful. We conclude that the warrantless arrest of Amparo in her home violated her constitutional rights and that all of her post-arrest statements should have been suppressed.

## A. The Arrest

■ At the outset we reject Amparo's contention that there was not probable cause for her arrest. To the contrary, the Task Force had ample grounds for believing she had committed a crime. They had found her name in records kept by her brother, from whose apartment they had also seized cocaine, indicating that she was a major customer for narcotics. She had been observed two weeks before her arrest participating with Fernando in a suspicious delivery to Eugenio Hurtado, who also was suspected of narcotics trafficking. On the night of her arrest, she visited 633 Grand Street, the building from which the Mesas had just emerged when they were arrested with a quantity of cocaine. Shortly after Amparo returned home from 633 Grand Street carrying a capacious handbag, her husband left home with a yellow plastic bag and was shortly arrested after discovery in his car of a yellow plastic bag containing a pound of cocaine. A person of reasonable caution could conclude from these facts that Amparo had committed narcotics-related offenses.

■ Although the officers had probable cause to arrest Amparo, a separate question is posed by the warrantless entry into her home to effect the arrest. The Fourth Amendment does not permit a warrantless entry into a suspect's home to arrest him unless the circumstances are exigent or an occupant has consented. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Reed*, 572 F.2d 412 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). The government does not suggest that the entry into the Medinas' home was justified by exigent circumstances; it argues solely that, while en route to his house Fernando consented to a search of the house, and that "his consent provided proper authority not only for entry to search the house, but also to arrest Amparo." (Gov't Brief at 42). This contention cannot be sustained. As previously noted, Agent Frawley had decided that the possibility of obtaining Fernando's consent in the car should be abandoned; and the other events prior to entry into the house, detailed below, would not support a finding of consent.

Following Fernando's arrest near Hurtado's building, four members of the Task Force were on the scene of the arrest; various of them told him they were taking him to his home in order to arrest his wife. No one asked his permission to enter in order to effect this arrest. No one indicated to him that either he or Amparo had any choice as to whether or not the agents would enter. As can be seen from the testimony quoted in the margin,[11] it was quite clearly present-

---

11. Ramos's testimony as to the agents' plan before leaving the scene of Fernando's arrest was as follows:

Q Now, before you left that location driving the Medina car, had you received any instructions from Agents Palombo or Skelly, as to where you all were to go?
A Yes.
Q Who did you receive instructions from?
A Skelly told us that we were going to proceed to the Medina house.
Q Did he tell you why you were going to Medina's house or the group was going to Medina's house? For what purpose?
A Yes.
Q What did he say the purpose was?
A He said we were going to go in the house with Medina and we are going to arrest Medina's wife.

Q Amparo Medina?
A Yes.
Q Did he indicate any other purpose?
A Not at that time, no.
Palombo's testimony as to what was said to Fernando on this subject was as follows:
Q Did you tell Mr. Medina that he was going to be transported back to his house?
A Yes, I did.
Q You did that yourself?
A I did that.
Q When did that take place?
A Shortly after he received his rights from Detective Ramos.
Q What did you say to him?
A I believe the words, he asked me what was next. And I said, we're going back to your residence. He said, what for? And I said, to arrest your wife.

ed to him as a *fait accompli*. Indeed, so far from seeking his consent to enter, upon their arrival Fernando was informed that if he caused any problems on entering, physical force would be used. We can only conclude that when Fernando caused Amparo to open the door he was merely submitting to the officers' show of authority.

Nor was Amparo's consent requested. When they reached the Medina house the agents had Fernando knock and identify himself; they were silent until the door was opened. They did not then ask Amparo if they might enter. They simply entered, with Palombo immediately waiving the yellow bag at her, telling her she was in trouble.[12]

■ Given the totality of the circumstances, we conclude that there was no consent to the entry into the Medinas' home, and that the entry and the arrest of Amparo were therefore unlawful. Her post-arrest statements must be suppressed, *Dunaway v. New York, supra; Brown v. Illinois, supra,* and her conviction, resting in part on these statements, must be reversed.

## B. *The Seizures at the Medinas' Home*

■ In light of the possibility of further proceedings with respect to Amparo

> Q So, at that point—is that all you said to him?
> A Words to that effect. Generally, that's it, yes.
> Q And you said to arrest your wife, after that, did he ask you any questions as to what for or why?
> A Yes, I believe he asked why she was being arrested and I told him it was for conspiracy.
> Q Does that complete to the best of your recollection the conversation you had with Mr. Medina prior to his being placed in Frawley's car and being driven to his residence?
> A Yes.
> Q So, after he left you and went to the Frawley car, he did not receive from you any indication that it was a desire of you or the other agents to search i[n] his house?
> A I did not say that to him, no.
> Q Did Detective Ramos tell him that in your presence prior to his being transported?
> A No, he did not.
> Q How about Detective Frawley or Sgt. Skelly?
> A No.

Medina, we explore here certain questions as to whether there was a valid consent to the search of the Medinas' house. The government contends that Fernando first consented to the search while he was being transported home, and consented again— with Amparo—after the agents were in the house. We have already rejected the first of these contentions, and we find the second highly problematical. Our difficulty with the contention that consent to search was given by the Medinas in the house begins with our finding that the agents' presence in the house was unlawful. The normal result of such an illegal entry is to make unlawful any ensuing interrogations or searches, *see Brown v. Illinois, supra; Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and indeed we have ruled that Amparo's post-arrest statements must be suppressed on this basis. By parity of reasoning, suppression is required of any items seized during the search of the house, unless the taint of the initial entry had been dissipated before the "consents" to search were given. To justify a finding of dissipation of the taint resulting from unlawful government action, the government must show that the subsequent consent " 'was *sufficiently* an act of free

> Q So all that Mr. Medina had been told by you or by anyone else to your knowledge was that he was being taken back to his house for the sole purpose of affecting [*sic*] the arrest of his wife?
> A That's correct.

12. Frawley described their entrance as follows:
> Q How did you gain access to the residence of Fernando and Amparo Medina?
> A Prior to leaving Francis Lewis Boulevard, we removed the handcuffs from Mr. Medina and then proceeded to the vicinity of his residence. I parked my car a half a block away. Mr. Medina exited the vehicle. I told him, "If you cause any problems on entering, physical force would have to be used," something to that effect.
> He said there would be no problems. We walked up to the front door. He knocked on the door and a female stated, "Who," he stated, "Me.["]
> With that, the door opens and his wife, Amparo, was standing there. We walked in. I had my shield out. I stated, "Police," and walked past her.

will to purge the primary taint of the unlawful invasion.'" *Brown v. Illinois, supra,* 422 U.S. at 599, 95 S.Ct. at 2259, (emphasis therein). This ordinarily involves showing that there was some significant intervening time, space, or event. *Id.* at 604, 95 S.Ct. at 2262. The time between the entry into the Medina's house and their "consents" to the search was, as we read the record, a matter of an hour or so; and we are unaware of any event of significance between entry and "consent." As the issues relating to dissipation were not argued either here or below, however, we leave to the district court the initial determination of this question.

In determining whether the Medinas' consent was valid, the district court will also want to consider whether their action was influenced by any misinformation from the agents. After Amparo was arrested, the agents telephoned an Assistant United States Attorney to attempt to obtain a search warrant. The record as to what followed raises questions as to whether there was a likelihood that a warrant could or would be obtained on the basis of the information then possessed. Frawley, the first agent to talk to the AUSA, testified that the AUSA "was asking certain questions about the probable cause." Frawley's response was that the supporting affidavit would not be his, and that the AUSA should speak with Palombo, who was the case agent. Skelly and Palombo then recited to the AUSA the facts the agents knew and Palombo asked whether there was probable cause for a warrant. The AUSA told Palombo to see what other facts were known and to get back to him if he found any other information that would support probable cause. The record does not reflect whether the AUSA told Palombo that the facts recited were or were not sufficient to procure a warrant.[13]

Further, Frawley had gained the impression, although the AUSA never stated it explicitly, that a warrant would not be obtained that night. Frawley also believed that it would be impractical to secure the house until the next day, and had so informed the AUSA, because the agents were needed in Brooklyn to assist with the activity there. Thus there was a question as to whether the agents would be willing to wait for the issuance of a warrant authorizing them to conduct a search. Nevertheless, after his conversation with the AUSA, Frawley told Fernando that they were in the process of attempting to obtain a search warrant, that it would take time and that the house would be secured in the meantime. He testified that, "with the time element, that was required, I knew it was impractical. I didn't tell Mr. Medina that it was impractical."

■ The question whether a consent has been given freely and voluntarily, or whether instead it has been given in the impression that there is in fact no choice, is one to be answered from the "totality of all the circumstances." *Scneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047. It is clear that if officers represént that they already have a search warrant, a permissive statement by the property owner cannot be considered a voluntary consent. "The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Bumper v. North Carolina, supra,* 391 U.S. at 550, 88 S.Ct. at 1792. On the other hand, the fact that an officer states that a search warrant can be obtained does not necessarily constitute a coercive factor negating con-

---

13. Palombo's testimony was as follows:

Q Did the desirability or possibility of a search warrant come up in any of your discussions with any of these people on the phone?
A Yes.
Q And did you request permission for a search warrant?
A I did call the United States Attorney and I did relay a set of circumstances and asked him at this particular time whether or not there was a sufficient probable cause to get a search warrant for the house.
He advised me to see what other circumstances there were and to get back to him if I found any more probable cause or any other information that would help. And I terminated the conversation at that particular point.

sent, and our Court has upheld a finding of consent in circumstances where officers stated that they could apply for a warrant and would "no doubt" obtain one. *United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974); *see United States v. Bracer*, 342 F.2d 522, 525 (2d Cir.), *cert. denied*, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965) (" 'the consent was with knowledge that the agents could and would obtain a warrant' "). In *Faruolo*, however, the district court had found that the officer's "advice was well grounded. There was no deceit or trickery," 506 F.2d at 494, and we concluded that "the well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion." *Id.* at 495. By contrast, in *United States v. Curiale*, 414 F.2d 744 (2d Cir.), *cert. denied*, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969), in which there was no probable cause basis for the issuance of a warrant and the agents were aware of that fact, the court expressed reservation as to whether a consent would have been upheld if the agents had allowed the defendant to base his consent on the *mistaken* belief that a warrant could be obtained.

We view the circumstances reflected in the present record as falling somewhere in the area bounded by *Bumper v. North Carolina, supra*, in which there could be no consent because the agents represented that they had a warrant, *United States v. Faruolo, supra*, in which the officers had a well-founded belief that they would obtain a warrant, and the hypothetical situation in *United States v. Curiale*, in which the defendant held the mistaken belief that a warrant would issue while the agents *knew* there was not probable cause. The record here is susceptible to various inferences on several material points. Although we do not believe the agents were required to keep the Medinas informed of the practicalities, questions remain as to whether the Medinas were misinformed, and their consents vitiated.

Whether or not, in the totality of all of the circumstances, including the unlawful entry and the conversations that followed, the government carried its burden of proving that a consent to the search of the Medina home was freely and voluntarily given is a question meriting further consideration on remand. The bare finding of the district court "that Mr. Medina, a resident of the apartment *consented* to the search conducted" (emphasis in original) is inadequate to reflect whether or not all the pertinent factors were considered. At a minimum, detailed findings concerning the circumstances under which the alleged consents were given would be necessary to assess the validity of those "consents."

## V

■ Vasquez presses three arguments on this appeal. He contends that his Fourth Amendment rights were violated by the agents' warrantless entry into and search of the fourth floor apartment at 633 Grand Street, because there were no exigent circumstances justifying a warrantless entry. In addition, Vasquez contends that, even if the items seized in the apartment are not suppressed,[14] the evidence presented at trial was insufficient to convict him of either possession of or conspiracy to possess narcotics. Finally, Vasquez contends that his thirty-year sentence was imposed in an illegal manner. We reject Vasquez's contentions as to the lawfulness of the search and the sufficiency of the evidence, but remand for further consideration as to sentencing.

### A. *The Search of the Fourth Floor Apartment at 633 Grand Street*

■ In assessing the legality of the entry into and cursory examination of the fourth floor apartment, we return to the premise that warrantless searches and seizures are *per se* unreasonable, subject to a

---

**14.** If the entry was lawful, items in plain view were lawfully subject to seizure. *United States v. Gomez, supra; United States v. Liberti*, 616 F.2d 34, 36–37 (2d Cir.), *cert. denied* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980). To the extent that items seized had not been in plain view, the district court granted the motion to suppress.

few well-delineated exceptions. *Schneckloth v. Bustamonte, supra.* One of the exceptions recognized in this Circuit is the "security check" or "protective sweep" incident to a lawful arrest.[15] When police officers have lawfully entered premises to effect an arrest, they are entitled to make a "quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers." *United States v. Gomez, supra,* at 1008; *accord, United States v. Christophe,* 470 F.2d 865, 869 (2d Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973); *United States v. Cognato,* 408 F.Supp. 1000, 1005 (D.Conn.) (Newman, J.), *aff'd without opinion,* 539 F.2d 703 (2d Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 806 (1977). While the validity of this exception has not been ruled on by the Supreme Court, it is consistent with a number of the Court's dicta. In *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), for example, the Court discussed the absence of exigent circumstances justifying dispensation with a search warrant, observing that "[n]o evidence or contraband was threatened with removal or destruction . . . ." *Id.* at 15, 68 S.Ct. at 369. More recently the Court noted that in executing an arrest warrant, "the police may need to check the entire premises for safety reasons . . . ." *Payton v. New York, supra,* 445 U.S. at 589, 100 S.Ct. at 1381. The reasonableness of a quick security check of the premises for other persons is supported by the reasoning in *Chimel v.*

*California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) which held that a *full-scale* search incident to an arrest is impermissible:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

395 U.S. at 762–63, 89 S.Ct. at 2039. Like reasoning justifies the minimal additional intrusion of a quick check through the home to detect the presence of others who might attack the arresting officer or destroy evidence. *See United States v. Agapito,* 620

---

**15.** As part of this argument Vasquez also asserts the proposition that his own arrest was unlawful because the agents had no probable cause to arrest him. He did not assert in the district court that his arrest was unlawful. At the end of the suppression hearing, his attorney did purport to tick off "eleven instances of illegality"; but none of them related to the arrest of Vasquez. Vasquez is therefore barred from making this argument on appeal, but we note that his contention has no merit in any event. Vasquez had been seen entering the building with Amparo Medina. After Amparo left the building, her husband Fernando was caught with a package of cocaine under circumstances suggesting that Amparo had brought the cocaine from the Grand Street building. The Mesas and Sanchez had also been caught carrying cocaine from the same building. (Vasquez has no standing to complain of the violation of Sanchez's rights. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Vasquez's reliance on the "automatic standing" doctrine of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), is to no avail. That doctrine was overruled in *United States v. Salvucci,* — U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).) Moreover, Palozzotto, one of the officers who arrested Vasquez, recognized him as a suspected major narcotics dealer he had previously arrested for cocaine dealing, and when he called out to Vasquez to stop, Vasquez, on recognizing Palozzotto, crossed the street and walked swiftly away from him. These events sufficed to provide reasonable grounds for belief that Vasquez had taken part in narcotics transactions that evening.

F.2d 324, 336 (2d Cir. 1980), *cert. denied* —— U.S. ——, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

Different considerations come into play, however, when a defendant is arrested outside his residence and the government seeks to justify an entry into the home for a security check. *Cf. Shipley v. California,* 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969) (per curiam) (where defendant is arrested outside his home, warrantless search of his home incident to the arrest violates Fourth Amendment). This situation differs in two fundamental ways from that of the security check incident to the arrest of a person inside his home. First, the arresting officer's need for protection from persons in the home will often be less compelling when the arrest takes place outside. Second, the government has an especially heavy burden in justifying a "breach of the entrance to an individual's home":

> The Fourth Amendment protects an individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable Government intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York, supra,* 445 U.S. at 589–90, 100 S.Ct. at 1381–82.

Although other courts of appeals have approved entry by police officers into a home as a security check, *see, e. g., United States v. Baker,* 577 F.2d 1147, 1152 (4th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Bowdach,* 561 F.2d 1160, 1168–69 (5th Cir. 1977), this Court has not heretofore been presented with circumstances in which such an entry was appropriate. In *United States v. Agapito, supra,* we indicated by way of dictum that such an entry would be permissible if the arresting officers had "(1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." 620 F.2d at 336 n.18. In the circumstances as they existed in *Agapito,* however, where the arrest took place in a hotel lobby seventeen floors below the room searched, and where constant surveillance of the room for two days before indicated that no one remained there, we held that a security check was not called for.

The circumstances at 633 Grand Street present a very close question. Siegel testified that the agents were concerned that people remaining in the apartment might destroy evidence there, and there was some basis for this. Jaramillo and Parra had tried to divert the officers' attention from the fourth floor by telling them they had come from the second floor; and Wright revealed that Jaramillo's conversation with her in Spanish, when the agents went to her second-floor apartment, asked her to confirm this misdirection. Such attempts at diversion suggested that the fourth floor apartment contained evidence, or other persons, or both. It is true that one officer who placed his ear to the door of that apartment heard no sounds from inside, but there was another basis for believing that one or more persons remained in the apartment. It was a cold night, and Jaramillo had come outside wearing only a shirt, pants, and slippers with no socks. He had no key with him, and it could be inferred that there was someone in whatever apartment he had come from—the fourth floor apartment according to Wright—to let him back in. It was therefore reasonable to

infer that evidence could well be destroyed if the persons remaining there were alerted to the agents' activities.

By the time the agents determined that Jaramillo's designation of the second floor was a red herring, there was ample cause to believe that any remaining occupant of the fourth floor would have been alerted. For most of the evening the agents had managed to effect their arrests and investigatory stops out of the line of sight of the apartment. The last stops, however, had been made in front of the building. Then, when Jaramillo's claim that he had been on the second floor was being investigated, there was an extended commotion resulting from the involvement of the apparently unsuspecting Mrs. Wright and the entry of several agents into her apartment in the expectation, based on Jaramillo's statement, that they were at the scene of the cocaine operation.

We do not accept Vasquez's contention that a security check was improper because the duration of the commotion would have allowed the destruction of any evidence to be completed before the officers entered. We do not think the exigency abated because the second-floor tumult lasted 10–15 minutes. What is troublesome, however, is the fact that the agents went far beyond the bounds of the permissible security check. Although it took but a few minutes to determine that there were no other people in the apartment, *they remained there for sixteen hours.* They seized not only items that were in plain view, but also, obviously, items that were completely hidden from view. The district judge suppressed thirteen items that he determined were "the products of a thorough search of the premises." Had the district court inferred from these facts that the agents' intention in entering the apartment was not to conduct a security check, we would be hard–pressed to hold such a finding clearly erroneous.

■ In fact, however, the district court implicitly found that the officers entered with the intention to make a security check, and explicitly found that there were reasonable bases for their belief that additional evidence was present in the apartment and that there might be someone there who could destroy it. Since these explicit findings, which are not clearly erroneous, justified a security search, the items in plain view during the course of that search were properly seized.

B. *The Sufficiency of the Evidence*

■ Vasquez was convicted of possession of and conspiracy to distribute the cocaine seized in the fourth floor apartment at 633 Grand Street. He challenges the sufficiency of the evidence that supported those convictions on the grounds that it was not shown that he was the renter of the apartment, or that he was a knowing participant in a conspiracy.

Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find that evidence an adequate basis for a reasonable juror to find Vasquez guilty on both counts. The basis for concluding that Vasquez had rented the apartment was in the testimony of Dora Wright, who was called as a hostile witness by the government. Wright's testimony was full of conflicting statements, any of which could have been believed or disbelieved by the jury. At trial, Wright denied that Vasquez rented the fourth floor apartment:

Q One of the people who showed up to express an interest in that apartment was the defendant Orlando Vasquez?

A Yes, with a friend.

Q Because you had seen Mr. Vasquez so many before [*sic*], you felt comfortable in renting the apartment?

A It wasn't really to him. I don't know if it was to him. He went with a friend who was taking the apartment.

Insofar as Wright's testimony denied that it was really Vasquez who had rented the fourth floor apartment, the government sought to impeach her by introducing her prior signed statement (set forth in full at note 6, *supra* ). Wright variously rejected

and confirmed parts of that statement; she admitted having stated that Vasquez had rented the apartment:

Q Did you also tell Detective Palazzotto that at this time Orlando also told me that the apartment would be for him, Orlando, his brother and a friend; did you tell Detective Palazzotto that?

A That night, yes, I did.

Nevertheless, at trial (as at the suppression hearing) Wright stated that in fact a man named Jorge Osorio had rented the apartment. Wright had two explanations for the fact that her written statement said Vasquez alone rented the apartment. One was that she had told Palazzotto that Osorio had rented the apartment, but Palazzotto had simply refused to include that information in her statement. The other explanation was that she had *not* told Palazzotto about Osorio, and that her reason for not telling him was that at about 3:00 p. m. on November 29 (that is, several hours before the Task Force "discovered" 633 Grand Street), Osorio had telephoned her and threatened her and her family with harm if she mentioned his name.

The jury was properly instructed as to the use it could make of Wright's written statement. Our review of the record persuades us that there was ample testimony by Wright, and impeachment value in the written document, to allow the jury to infer that Wright "really" rented the fourth floor apartment to Vasquez.

As for the possibility that Vasquez may have been merely an innocent bystander who, without participating, permitted a guest to use his apartment, the evidence readily permitted the contrary inference. When the agents entered the apartment, they found cocaine or associated paraphernalia in plain view in a number of different parts of the apartment. Vasquez brought Amparo Medina to the apartment; Frawley saw Vasquez attempting to open the inner door to the building, apparently with a key. Vasquez was not seen exiting the building until after Amparo, the Mesas and Sanchez had left and 2½ pounds of cocaine had been recovered; indeed, Vasquez was the last person to leave the apartment. Upon his exit from 633 Grand Street, when Palazzotto, whom he recognized, called to him to stop, Vasquez crossed the street and walked swiftly away from Palazzotto, conduct from which consciousness of guilt could be inferred. These facts were a sufficient basis upon which a rational jury could find Vasquez guilty of possession of the cocaine in the apartment.

As to whether Vasquez was also a member of a conspiracy to distribute cocaine, we conclude there was ample evidence to support the jury's verdict. *See United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (evidence sufficient to permit inference of active participation in narcotics conspiracy where defendant's entire house was a "stash" for large amounts of cash, narcotics and related paraphernalia, and defendant was present while others entered and left carrying containers of heroin). In addition, we note that the approximately 3½ pounds of cocaine seized on November 29 had an estimated wholesale value of $100,000 and retail value of $300,000. From the fact that not one of the eleven persons who was arrested after having been in the fourth floor apartment had any significant amount of cash in his or her possession, the jury could easily infer that the distribution was a cooperative enterprise.

C. *The Sentence*

Finally we turn to the claim that the sentence imposed on Vasquez was unlawful. Vasquez received a sentence of two consecutive prison terms of fifteen years and a special parole term of ten years. This was twice as severe a sentence as was given to any other defendant in this case, but it did not exceed the fifteen years limit per offense imposed by 21 U.S.C. §§ 841(1)(a) and 846.

Generally, a sentence imposed by a federal judge is not subject to review if it is within the statutory limitations. *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3046, 41 L.Ed.2d 855 (1974); *United States v. Tucker*, 404 U.S.

443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Tramunti,* 513 F.2d 1087, 1120 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Sentencing is an area in which a trial judge has "broad discretion" and he is ordinarily "under no obligation to give reasons for his sentencing decisions." *McGee v. United States,* 462 F.2d 243, 247 (2d Cir. 1972). Once given, however, these reasons may be considered and the basis for the sentence scrutinized. A sentence within the statutory maximum is reviewable if the possibility exists that it was based on false assumptions or false information. *United States v. Mejias,* 552 F.2d 435, 437 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Robin,* 545 F.2d 775 (2d Cir. 1976).

 In sentencing Vasquez, Judge Bramwell stated that from what he had seen during the trial, "the jury could find that this defendant was responsible for the narcotics, drugs and paraphernalia in the apartment ... could find that this defendant was one of the leaders [of the drug operation]." This was the major reason he articulated for the sentence imposed. While we agree that the jury *could* have found that Vasquez was the leader of the conspiracy, it was not required to do so in order to convict him; it need not have found more than that he was a member. Thus this sentence, unlike a sentence explicitly based on the judge's own evaluation of the defendant's role in the criminal enterprise, may have been based on an inappropriate assumption. On the other hand, it may be that Judge Bramwell had reached his own conclusion concerning Vasquez's role and was merely expressing his view in terms of what the jury could have found. But with a sentence of such severity, we prefer to avoid even the possibility that the judge was improperly relying on a finding not made by the jury.

We therefore vacate Vasquez's sentence and remand for clarification and resentencing.

## CONCLUSION

The convictions of Vasquez, Sanchez, Hernando and Clara Mesa, and Fernando Medina are affirmed. The conviction of Amparo Medina is vacated and remanded for further proceedings not inconsistent with this opinion. The sentencing of Vasquez is vacated and remanded for clarification and reconsideration in accordance with this opinion.