**UNITED STATES of America, Appellee,**

v.

**Paul NARGI, Defendant-Appellant.**

**No. 942, Docket 83–1377.**

United States Court of Appeals,
Second Circuit.

Argued March 13, 1984.

Decided April 16, 1984.

John J. Bergeron, Burlington, Vt. (Howard E. VanBenthuysen, Desautels & Bergeron, Inc., Burlington, Vt., of counsel), for appellant.

Holly K. Harris, Asst. U.S. Atty., Rutland, Vt. (George W.F. Cook, U.S. Atty. for the Dist. of Vt., Peter W. Hall, Asst. U.S. Atty., Rutland, Vt., of counsel), for appellee.

Before FEINBERG, Chief Judge, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Paul Nargi appeals from an order of the District of Vermont, Albert W. Coffrin, *Chief Judge,* denying his pretrial motion to suppress 628 pounds of marijuana found in a van he was driving on April 14, 1983. Subsequent to that ruling, the defendant pleaded guilty to a charge of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and was sentenced to two years imprisonment followed by a three-year special parole term. The plea was entered pursuant to an agreement preserving Nargi's right to appeal the suppression ruling.

This case stems from events on the night of April 14, 1983, in and around Burlington International Airport. Shortly before 9:00 P.M. that evening, Officer Steven A. Cheney of the Burlington, Vermont, Airport Police received a phone call from Trooper Lawman of the Vermont State Police, who relayed information he had received from Jack Barnwell, a United States Customs Officer stationed in North Carolina. Barnwell had advised Lawman that a twin-engine aircraft with mud on its fuselage and bearing the tail number T or N6240J, which was suspected of carrying bales of marijuana, had taken off from North Carolina and was believed to be headed for Burlington where it would arrive sometime between 9:00 and 9:30 that evening. He reported that two white men were aboard the plane, one approximately six feet, two inches tall with a beard, the other slightly shorter and clean shaven. Barnwell also reported that the men and the aircraft had made two earlier trips to Burlington from North Carolina, and he had noted that the men had seemed very nervous on the first trip, less so on the second, and not very nervous at all on the night of April 14.

Officer Cheney called the South Burlington Police Department to request assistance, and then asked the airport control tower to inform him when the suspect aircraft made radio contact with the tower.

Cheney next called Special Agent Theodore Handoga of the Drug Enforcement Agency, to inform him of what he had learned. Handoga had also received the tip about the twin-engine plane and was attempting to gather more information. Cheney agreed to keep Handoga posted about the flight's arrival. Five minutes later, after Handoga had contacted his sources, he confirmed Cheney's information, advising that the plane was a gray Beech Baron with a blue stripe, bearing the tail number N6240J. The two men spoke once more when Cheney learned from the airport control tower that the plane in question had radioed that it expected to arrive in 10 or 15 minutes; Handoga instructed Cheney not to allow the aircraft or anyone associated with it to leave the airport, and then departed for the airport.

Cheney, who had been joined by another South Burlington police officer, drove in his airport police "Bronco" to a point near the southern end of the airport. Airport traffic was very light at that time, and there were no other ground vehicles in operation in the area. The officers were joined by a third South Burlington policeman as they awaited the plane's arrival. They were eventually notified by the tower that the aircraft was about to land.

Cheney saw the plane as it was taxiing south along Runway 15 toward a group of hangars in the far corner of the airport known as the "alert area." He lost sight of the craft as it went down a grade and behind some buildings, still heading in the same direction. The officers contacted the tower to verify that the plane was destined for the alert area and then drove to that area.

Upon reaching the dark alert area, the officers began checking the various buildings. Officer Cheney exited the Bronco to look inside one of the hangars but he did not see any moving aircraft or any planes meeting the description he had received from Trooper Lawman. Cheney got back in the Bronco and began driving toward another hangar.

Just then a van drove past the Bronco, moving at a normal rate of speed. It was coming from the back of the alert area and was headed for the airport exit. The van was driven by a white, clean shaven male; no other occupants were visible. As the van passed the Bronco and cut across its headlights, the driver turned his head slightly to the left, away from the police vehicle. Officer Cheney considered the motion suspicious, and he also noted that the van was capable of carrying bales of marijuana.

Cheney pulled out after the van and signaled it to stop. The van stopped and Cheney brought his Bronco to a halt approximately 20 feet behind the van. The van's driver jumped out immediately, leaving the driver's door open and walking back toward the police vehicle. The police simultaneously exited the Bronco. Cheney walked directly toward the rear of the van with his hand on his service revolver; he unsnapped the holster, but did not remove the gun. One of the officers went to the right of the van, carrying a shotgun. The third officer went to the left of the van, and stood in the "ready position" with his revolver drawn.

Cheney met the driver of the van midway between the two vehicles. He asked the driver for identification and informed him that he had been stopped because of suspected marijuana trafficking. The man produced papers identifying himself as Paul Nargi. Cheney then asked whether Nargi would mind opening the van; Nargi replied that he would. Cheney walked to the rear of the van and looked through the windows with the aid of a flashlight. In the course of his 10 years' police experience he had seen bales of marijuana. He now observed what appeared to be approximately 12 or 15 bales of marijuana. He then placed Nargi under arrest.

Following his arrest Nargi was charged in an indictment with conspiring to distribute marijuana, 21 U.S.C. § 841(a)(1) (Count 3), possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1) (Count 4), and possession of marijuana aboard an air-

craft in violation of 18 U.S.C. § 2 (Count 5). On June 24, 1983, Chief Judge Coffrin held a hearing upon Nargi's motion to suppress the marijuana as illegally seized, at which Officer Cheney, DEA Agent Handoga, and U.S. Customs Officer Jack Barnwell testified. The motion was denied and Nargi then pleaded guilty to Count 4 pursuant to a plea agreement reserving his right to appeal the denial of the suppression motion, which is now before us.

## DISCUSSION

Nargi argues that the seized marijuana must be suppressed as the fruits of an illegal search. Since the government concedes that there was not probable cause to arrest Nargi at the time his van was stopped, the threshold question is whether the stop can be justified as an investigatory measure permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. Nargi claims that the police did not have sufficient grounds to make such a stop and that in any event the manner in which they effected the stop was so intrusive as to amount to an arrest. We disagree with both contentions.

■■■ The controlling principles are well established. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). On the other hand, a policeman does not have unbridled discretion to make an investigatory stop; he must be aware of specific, objective and articulable facts giving rise to a reasonable suspicion that the suspect is, was, or is about to be engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam); *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 146–49, 92 S.Ct. 1921, 1923–1924, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. at 1879; *United States v. Harley*, 682 F.2d 398, 400–01 (2d Cir.1982); *United States v. Streifel*, 665 F.2d 414, 421 (2d Cir.1981); *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir.1980); *United States v. Buenaventura-Ariza*, 615 F.2d 29, 31 (2d Cir.1980). A reviewing court must determine in each case whether the policeman's suspicions were reasonable under the circumstances. *Sibron v. New York*, 392 U.S. 40, 59, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968); *United States v. Delos-Rios*, 642 F.2d 42, 45 (2d Cir.), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981).

■■■ Upon the record facts, we have little difficulty in concluding that the police had ample justification for stopping Nargi's van. Officer Cheney had a detailed description of a plane that was reasonably suspected of carrying bales of marijuana. Once that plane landed at the Burlington airport and the officers were unable to locate it, the police were not required to throw up their hands and forget the whole thing. As the Supreme Court stated in *Adams v. Williams, supra*, 407 U.S. at 146, 92 S.Ct. at 1923, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Given the lack of vehicular traffic at that time the police might have been justified in briefly detaining any vehicle capable of carrying bales of marijuana that attempted to leave the airport. Indeed, Nargi's was the only ground vehicle in operation in that area. But here the police had additional facts relating to Nargi's van that made it in particular a potential object of suspicion. First, it was sizeable enough to be capable of carrying bales of marijuana in a concealed fashion. Moreover, Nargi was coming from the general direction of the "alert area," where the plane had been headed when last seen.

Similar facts have been held to provide adequate grounds for a reasonable suspicion of unlawful activity. In *United States v. Cortez, supra,* for instance, the Court upheld a stop by the border patrol of a group that illegally transported aliens across the Arizona border. The patrol knew little about the suspects other than that they customarily operated on clear weekend nights at a particular point on the border. An observation post was established on the highway approximately 45 minutes east of that point and the officers waited for vehicles which first travelled west past the observation post and then returned 90 minutes later. The first such vehicle capable of carrying a number of illegal aliens was stopped and the suspects arrested; the Supreme Court upheld the stop. Similarly, in *United States v. Jackson,* 652 F.2d 244, 248 (2d Cir.), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981), this court upheld a stop of a suspected bank robber, relying in part on the fact that the suspect's car was coming from the direction in which the robber had been seen fleeing.

Two additional facts relied on by the police in the present case were that Nargi matched the description of one of the men aboard the plane—a clean shaven white male—and that he diverted his face when he passed the officers'. vehicle. Although neither of these considerations is in itself of overwhelming weight, when considered in conjunction with the rest of the information available to the police, they lend some support to the reasonableness of the decision to stop Nargi. We therefore hold that under the totality of the circumstances the police had sufficient specific and articulable facts to justify a brief police detention of Nargi's van.

 Nargi next contends that even if the police did have reasonable grounds for detaining him their actions in doing so were so intrusive as to convert the investigatory stop into an arrest. As we stated in *United States v. Vazquez,* 638 F.2d 507, 520 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981), "if probable cause is lacking, the intrusion must be no greater than the circumstances require." The heart of Nargi's argument that the police did not behave reasonably is the fact that weapons were drawn, which is an intrusion that calls for careful scrutiny. A display of guns by the police, however, does not automatically convert a stop into an arrest. *United States v. Streifel, supra,* 665 F.2d at 424 n. 10; *United States v. Jackson, supra,* 652 F.2d at 249–50; *United States v. Bull,* 565 F.2d 869, 870 (4th Cir.1977) (per curiam), *cert. denied,* 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978); *United States v. Russell,* 546 F.2d 839, 841 (9th Cir.1976). As we have stated in the past, "there is no hard and fast rule concerning the display of weapons" in investigative stops. *United States v. Harley, supra,* 682 F.2d at 402. Instead, we must look at "the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, [and] the reaction of the suspect to the approach of police ...." *Id.*

 Using these factors as a measure in the present case, the suspected crime was a serious felony. There were good grounds for the officers' suspicions of large-scale marijuana trafficking. The stop took place at night in a dark, isolated part of the airport. We have repeatedly recognized that weapons are often used by persons engaged in such offenses. *See United States v. Oates,* 560 F.2d 45, 62 (2d Cir. 1977); *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Moreover, the officers had received information that two men were aboard the plane, yet only one man exited the van; the police could reasonably believe that a second man may have been armed and hidden inside the van. Finally, when Nargi jumped from the van as soon as it came to a halt, the police may well have considered his potentially aggressive behavior to pose a danger to them.

Under all of the circumstances, the officers were fully justified in acting cautiously and having two weapons drawn since

there were articulable grounds for fearing danger. It is significant that Officer Cheney, who actually approached Nargi, did *not* remove his revolver from its holster. As the Supreme Court stated in *Terry v. Ohio, supra,* 392 U.S. at 23, 88 S.Ct. at 1881, "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty...."

Other aspects of the stop militate against Nargi's claim. The steps taken to halt the van were unobtrusive, with only one police vehicle signaling it to stop and then pulling up 20 feet behind it. In *United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982), we stated that "[i]n cases involving stops of cars, we have considered the number of police officers and cars used to effect the stop; whether the police blocked the car in motion or otherwise completely impeded its movement, or whether they merely pulled up near it ...." In *Marin,* we found that an arrest did result because the suspect's vehicle was surrounded by three or four police cars. Similarly, in *United States v. Ceballos,* 654 F.2d 177 (2d Cir.1981), at least three police cruisers blocked the suspect's car from in front and from the rear, preventing any movement. In this case, there was no such overwhelming demonstration of force as occurred in *Marin* and *Ceballos.*

Two other factors lend support to our holding that the officer's behavior did not amount to an arrest. First, when Officer Cheney confronted Nargi between the van and the police Bronco, he asked Nargi whether he would "mind" opening the van. That request is completely inconsistent with the claim that Nargi was already under arrest; if Nargi had been arrested the police would not need his permission to search the van. Finally, we note that the duration of the investigatory stop was extremely brief; it was only a matter of a minute or so before Officer Cheney saw the bales of marijuana in the van, which provided probable cause for Nargi's arrest.

Accordingly we hold that the police had sufficient objective grounds for stopping Nargi's van, and that their actions following the stop were reasonable under the circumstances. The judgment of the district court denying Nargi's suppression motion is affirmed.