UNITED STATES of America, Plaintiff,

v.

**Victor PEREZ, Defendant.**

**No. CR 89–408 (ADS).**

United States District Court,
E.D. New York.

March 9, 1990.

---

**348**

Andrew J. Maloney, U.S. Atty., E.D. New York, Brooklyn, N.Y. by Daniel F. De Vita, for plaintiff.

Charles Lavine, Forest Hills, N.Y., for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

■ The instant motion raises the issue of whether a defendant was "reasonably" stopped and frisked within the dictates of the Fourth Amendment to the United States Constitution where the sole basis for the stop was the fact that the defendant was in proximity to or accompanied a person about whom the police had a particularized reasonable basis to stop and/or probable cause to arrest. Because the instant record is devoid of any evidence of criminal activity, danger or other exigency as to the defendant prior to his stop and frisk, the Court finds that there was no reasonable suspicion upon which to stop the defendant, no danger necessitating a frisk of the defendant and, therefore, any evidence obtained by the police as a result of the stop and frisk must be suppressed at trial.

## BACKGROUND

Defendant Victor Perez ("Perez") faces trial under a one count indictment charging him with conspiring to distribute and possess both cocaine and cocaine base (colloquially known as "crack").[1] Perez moves to suppress evidence seized from his person at and after the time of his allegedly unlawful stop and subsequent arrest.[2]

A hearing was held on September 22 and November 17, 1989 before Chief Judge Platt with respect to Perez's suppression motion. Four witnesses testified at the hearing: Pedro J. Velazco, a Drug Enforcement Administration ("DEA") group supervisor of a DEA Intelligence Unit, James Peterson, a New York City Police Department detective, and Howard Messing, also a New York City Police Department detective, were called to testify by the Government; Larissa Capellan, a resident (along with defendant Adam Diaz) of 295–305 Bennett Avenue, apartment 7–F in Manhattan, was called to testify by defendant Diaz. The testimony relevant to the instant motion is summarized below.

In the early evening of June 1, 1989, agent Velazco and at least eight other agents, investigators or officers went to 295–305 Bennett Avenue to effectuate a search warrant of apartment 7–B, which was thought to be Mr. Diaz's apartment. (Transcript ["Tr."] at pp. 7 and 19) Agent Velazco and the investigators with him broke open the door and entered into apartment 7–B, which they soon realized was not Mr. Diaz's apartment. (Tr. at pp. 7 and 20)

As a result of their error, at least six agents or investigators went back into the seventh floor hallway of 295–305 Bennett Avenue and waited while other agents attempted to communicate with the United States Attorney's Office, apparently in an effort to correct the search warrant. (Tr. at pp. 7, 21 and 28) Detective James Peterson, meanwhile, was told to maintain surveillance in a car parked on the street outside 295–305 Bennett Avenue, "in hopes of the subject vehicle or one of the subjects

---

1. Perez was initially indicted on three counts of a six count indictment against five defendants— Adam Diaz ("Diaz"), Alberto Palma, Ysrael Palma, Carlos Sanchez ("Sanchez") and himself. The Government consented to dismiss Counts Five and Six of the indictment (which charged Perez with criminal acts) on the basis that venue on those counts in the Eastern District of New York was improper.

Defendants Alberto Palma, Ysrael Palma, Diaz and Sanchez have all pled guilty to various criminal acts. Thus, all that remains is Count

One of the indictment, which charges Perez with violating 21 U.S.C. §§ 846 and 841(b)(1)(C).

2. Perez had also moved to suppress certain "similar act" evidence he contended the Government intended to introduce at trial. Based on the Government's representation that the evidence at issue would not be offered as "similar act" evidence but instead as proof of acts done by Perez in furtherance of the alleged conspiracy, counsel for Perez withdrew his challenge to the "similar act" evidence.

showing up at the apartment." (Tr. at pp. 51–52 and 54)

Agent Velazco then went down to the first floor of the building, and observed that Mr. Diaz's name was on mailbox 7–F. (Tr. at p. 8) Velazco went back upstairs to the seventh floor hallway, and approximately twenty five minutes later he observed a woman, later identified as Larissa Capellan, approach apartment 7–F with a key. (Tr. at pp. 8 and 25) Agent Velazco approached the woman, identified himself, and asked her if she would talk to him. Ms. Capellan informed him that she lived in apartment 7–F and "asked us to come in." (Tr. at pp. 8–9 and 26) [3] Agent Velazco then told Ms. Capellan why he was in the apartment building, and read Ms. Capellan "her constitutional rights in Spanish." (Tr. at p. 9) [4] Agent Velazco asked Ms. Capellan if she would consent to him searching her apartment and gave her a Consent Search Form (in English), which Ms. Capellan read, indicated she understood and signed. (Tr. at pp. 9–11 and 30–31)

Detective Howard Messing then searched apartment 7–F. (Tr. at pp. 12 and 27) The search revealed a "kilo press" ("which compresses cocaine into brick form") and what appeared to be records of drug transactions (tr. at pp. 16–17), as well as rubber bands, weights and a strainer (with what appeared to be cocaine residue on it). (Tr. at pp. 70–72)

Soon after the search of apartment 7–F, detective Peterson observed two men (later identified as Mr. Diaz and Mr. Sanchez) pass in front of his vehicle and walk into a parking lot directly across the street from 295–305 Bennett Avenue. (Tr. at pp. 52–53) Detective Peterson observed that Mr. Diaz was carrying a red and white plastic bag with "something in it" (tr. at p. 53), and that Diaz "seemed to be very cautious" but did nothing suspicious. (Tr. at p. 57) Detective Peterson also testified that he could not recall whether Mr. Sanchez was also carrying a bag. (Tr. at p. 65)

After Diaz and Sanchez passed, detective Peterson radioed agent Velazco and gave a description of Diaz. (Tr. at pp. 53–54 and 58) Detective Peterson testified that agent Velazco instructed him "to maintain surveillance on him [Diaz], and have the other members of the team [who also had radios] go to that location and basically stop the people, and ID them." (Tr. at pp. 59–60)

Detective Peterson did not observe Perez until after Diaz and Sanchez walked past his vehicle and into the parking lot across the street. (Tr. at p. 65) Moreover, detective Peterson testified, regarding Perez, that "I couldn't see from where I was if he was carrying anything. It was very dark and no lighting in the lot, so I couldn't really see." (Tr. at p. 66) Detective Peterson observed Perez standing near a telephone in the parking lot (he could not remember whether or not Perez was talking on the telephone) and Diaz and Sanchez walk over to Perez. (Tr. at p. 66)

Agent Velazco testified that after the recovery of the kilo press and the apparent drug records (tr. at pp. 16 and 39), and while in apartment 7–F, he received a radio transmission from detective Peterson, who was parked in an unmarked police car on the street opposite 295–305 Bennett Ave-

---

**3.** Ms. Capellan testified that the agents entered her apartment without permission and with their guns out, and that she was coerced into consenting to the subsequent search of her apartment. (Tr. at pp. 80–82) On cross-examination, the Government introduced into evidence an affidavit Ms. Capellan executed in support of a motion made by Diaz to suppress certain evidence, in which she made no mention of the agents' guns being displayed and in which she stated that she signed a consent to search form because she thought one was necessary to eventually recover the items which were being taken form her apartment. (Tr. at pp. 94–95) However, because Perez only challenges the constitutionality of his stop, not the search of

Ms. Capellan's and Mr. Diaz's apartment (Perez Supplemental Memorandum at p. 1), the Court need not determine whether or not the search of apartment 7–F was consensual.

**4.** Agent Velazco testified as to Ms. Capellan's ability to understand English as follows: "I talked to her in English and Spanish. I originally talked to her in Spanish thinking she didn't speak English, but I was corrected by the young lady who told me that she went to school in the United States and that she spoke fluent English." (Tr. at p. 30) Ms. Capellan testified at the hearing in English and without the aid of an interpreter. (Tr. at pp. 77–98)

nue. (Tr at p. 13)[5] Detective Peterson informed agent Velazco that two Hispanic males were approaching his location and specifically described one of the suspects, a description which agent Velazco determined fit the description of Diaz. (Tr. at pp. 13 and 36–37) Agent Velazco then advised detective Peterson "to make a stop" and "that I was on my way down." (Tr. at pp. 13 and 53) Agent Velazco testified that he ordered the "stop" on the basis of the items he had already found in apartment 7–F (tr. at pp. 41–42), and that "[a]nybody with Mr. Diaz was to be stopped." (Tr. at pp. 30 and 43) Detective Velazco added to his testimony concerning who was to be stopped as follows:

Q: No matter how many people were there?

A: It could have been 17, they would have been stopped.

Q: Regardless of any connection unknown or known concerning the apartment?

A: Once—yes, that's for me to determine, once I went downstairs and made a determination, or the evidence pointed out that they were involved or not involved. If they were involved, they would be arrested. If they were not involved, they would be free to go.

Q: But the stop was based on you coming downstairs identifying who was who and what was what?

A: That is correct.

Q: Until such time as you got there, the men were to be kept there?

A: That is correct. (Tr. at p. 43)

Approximately two or three minutes after the radio transmission detective Peterson observed "five or more" agents, most likely with their guns out, surround the three men, cause Mr. Perez and Mr. Sanchez to be placed face against a wall of the parking lot and Mr. Diaz to be put in a car. (Tr. at pp. 53, 61 and 66)

Agent Velazco testified that he reached detective Peterson in the street approximately two minutes after the radio trans-

mission. (Tr. at p. 61) When he arrived at detective Peterson's location, agent Velazco saw three Hispanic males stopped by the surveillance units outside 295–305 Bennett Avenue. (Tr. at p. 14) Agent Velazco was then informed by investigator McCabe that after approaching, stopping and patting down the three individuals the detectives recovered two bags, one containing currency and one containing a revolver, and that a beeper had been seized from Mr. Perez's person. (Tr. at pp. 14 and 47) Moreover, agent Velazco was told that the bag containing the revolver had been dropped to the ground "and it was between Mr. Sanchez and Mr. Perez," and that "the bag containing the money had been dropped to the ground, and was by Mr. Adam Diaz." (Tr. at pp. 15 and 69)

Detective Peterson testified that he saw investigator McCabe take a plastic bag from Mr. Diaz, but gave no testimony concerning property taken from Perez. (Tr. at p. 63) Detective Peterson testified that he did not leave his automobile until "[a]fter Agent Velazco and other members of the team had the defendant surrounded and stopped him and questioned him...." (Tr. at p. 54) According to detective Peterson, agent Velazco arrived on the scene approximately thirty seconds after Diaz was patted down. (Tr. at pp. 61–62)

Agent Velazco subsequently told an investigator to place Perez, Sanchez and Diaz under arrest and personally read the men their rights. Investigator McCabe then searched Mr. Perez and found $1,500 in his wallet. (Tr. at pp. 15–16 and 43–44)

THE MOTION

Perez moves to suppress evidence obtained from his person—a beeper and money—because his stop and resulting frisk were unlawful. Moreover, Perez moves to suppress the fruits of his unlawful stop and frisk—namely a photograph taken of him after his arrest which was later used to identify him as being a participant in a shooting. (*See* Perez Supplemental Memo-

---

**5.** Detective Howard Messing testified that the strainer, the rubber bands and the weights had also been found in apartment 7–F before agent

Velazco went downstairs after receiving the radio transmission from detective Peterson. (Tr. at pp. 70, 71 and 73)

randum at pp. 1–2; Government Supplemental Memorandum at p. 11)

Perez argues that the police possessed no information to support a reasonable suspicion that he was involved in the distribution of narcotics or criminal activity because (1) Perez was completely unknown to the agents prior to the stop, (2) Perez was merely seen in the company of Diaz, and (3) Perez did nothing suspicious in nature once under observation. (Perez Supplemental Memorandum at pp. 6–7)

The Government contends first that "[t]he standard governing the lawfulness of an investigatory stop is simply that 'the intrusion must be no greater than the circumstances require.'" (Government Supplemental Memorandum at p. 7 [*quoting United States v. Nargi,* 732 F.2d 1102, 1106 (2d Cir.1984) (*quoting United States v. Vasquez,* 638 F.2d 507, 520 [2d Cir.1980], *cert. denied sub nom,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 [1981])]) Next, the Government argues that the agents were aware of "specific, objective and articulable facts giving rise to a reasonable suspicion that Perez, Sanchez and Diaz were engaged in criminal activity" and "that a drug conspiracy existed and that more than one person was involved in this illegal activity." (*Id.* at pp. 8–9) As to Perez, the Government claims that:

"Perez's association with Diaz might seem innocuous when considered in a vacuum. However, the facts considered as a whole are compelling that Diaz and others were engaging in illicit drug dealing. Consequently, the agents would have been remiss in their duties if they were to have stopped Diaz but let anyone with him go without performing an investigatory stop." (*Id.* at p. 9)

The Government also contends that the intrusion as to Perez was "minimal," as he "had been stopped no more than two minutes and w[as] in a pat down position for 30 seconds before Agent Velazco arrived on the scene and ordered h[is] arrest." (*Id.* at p. 9)

## GOVERNING LAW

The instant motion challenges the constitutionality of the stop of Perez, and thus is governed by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the Supreme Court held that a police officer can stop a person without arresting him as long as the stop is reasonable. (*Terry,* 392 U.S. at 16, 88 S.Ct. at 1877)[6] The Second Circuit has clearly articulated the meaning of what is a "reasonable" stop under the Fourth Amendment, focusing the constitutional analysis on two factors—the basis for the stop and the degree to which the stop restrains the individual. (*Vasquez,* 638 F.2d at 520) In particular, the Second Circuit held that:

"[a]s to the first element, a detention does not comply with the Fourth Amendment unless the officers were 'aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that the individual was engaged in criminal activity.... In determining whether an officer's suspicion was reasonable, 'due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'"

\* \* \* \* \* \*

"The second factor in evaluating the reasonableness of a detention is the degree of intrusion into the individual's freedom. The greater the intrusion, the stronger the basis for the officers' action must be." (*Vasquez,* 638 F.2d at 520 [citations omitted]) (*Accord Nargi,* 732 F.2d at 1105 [In order to be able to make an investigatory stop, a police officer "must be aware of specific, objective and articulable facts giving rise to a reasonable suspicion that the suspect is, was, or is about to be engaged in criminal activity"])

The Court in *Vasquez* also made clear that the test of reasonableness was an objective one. (*Vasquez,* 638 F.2d at 520) (*See Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–1881).

---

**6.** There is no dispute by the Government that Perez was in fact stopped.

Moreover, once an officer has lawfully stopped an individual, the officer can "frisk" that individual only if he has "an articulable grounds for fearing danger." (*Vasquez*, 638 F.2d at 520 [*citing Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 [1968] ("In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous")]) The only justification for a frisk incident to a *Terry* stop "is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." (*Terry*, 392 U.S. at 29, 88 S.Ct. at 1884)

In *Vasquez*, for example, defendants Clara and Hernando Mesa, among others, challenged the constitutionality of their stop and subsequent arrest. The Court found that the arresting officers were justified in having a reasonable suspicion that the Mesas were involved in criminal activity because they were seen leaving the residence of a probable narcotics distributor and because their behavior was "suggestively erratic," in that they spent several minutes examining something and then drove off in "fits and starts for no traffic-related reasons, glancing in the mirror to check for surveillance." (*Vasquez*, 638 F.2d at 521–22) The Court in *Vasquez* concluded that "[n]or was the conduct of the officers of such intrusiveness as to require the district court to find it unreasonable on the basis of the information they then possessed," noting that the officers waited until the Mesas' car came to a halt, did not approach the car with their guns drawn, and only showed signs of force after Hernando Mesa locked the car doors, placed a package under his car seat and for 30–45 seconds ignored the officers' orders to open the doors and get out of the car. (*Id.* at 522)

Finally, evidence obtained after an illegal stop or arrest must be suppressed as "fruit of the poisonous tree" unless the evidence was obtained " 'by means suffi-

ciently distinguishable' " from the primary illegality so as to purge the primary taint of the unlawful invasion. (*Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 [1963] [*quoting* Maguire, Evidence of Guilt, 221 (1959)])

DISCUSSION

Applying the above legal analysis, the Court is unable to discern any evidence of "specific articulable facts" as to Perez which, viewed objectively, would lead a police officer to find that there was a reasonable suspicion that Perez was engaged in criminal activity. Furthermore, the Court finds that the officers' guns drawn, hands against the wall stop of Perez, also without any factual basis to suspect Perez of committing a crime, was an unreasonable intrusion upon Perez's freedom. Finally, in light of the lack of evidence that Perez posed a danger to the officers who stopped Perez, the frisk of Perez incident to the stop was also unreasonable.

As a result, the evidence obtained by the officers incident to the stop and frisk—the beeper—must be suppressed at trial. Moreover, the Court finds that the evidence obtained by the officers as a result of the illegal stop—the money (recovered during the search incident to the arrest) and the photograph of Perez (taken after his arrest)—were not obtained by means sufficiently distinguishable from the initial unlawful stop, and therefore also must be suppressed at trial.

In sum, the Government offered no particularized evidence whatsoever that Perez was engaged in any criminal activity other than that he was in a parking lot in close proximity to Diaz. There was no evidence adduced at the hearing that Perez had been known to the police prior to June 1, 1989 or was a subject of police investigation. The search of Diaz's apartment—the alleged basis for the stop of Diaz, Sanchez and Perez—yielded no evidence concerning Perez. There was no indication that he was a resident of apartment 7–F or that he had ever been to apartment 7–F. There was no evidence in apartment 7–F that Perez ever had any dealings or communication with

any resident of apartment 7–F. There is no nexus whatsoever between the alleged basis for the officer's reasonable suspicion to stop—the evidence found in Diaz's apartment, a description fitting that of Mr. Diaz and information that Diaz was with one other man (Sanchez) and that Diaz (and possibly Sanchez) was carrying a bag—and Perez, as Perez was not observed until after detective Peterson radioed agent Velazco and Velazco instructed his officers to stop Diaz and "anybody" with Diaz.

In fact, agent Velazco testified that anyone with Mr. Diaz, "regardless of any connection unknown or known concerning [Diaz's] apartment," was to be stopped, and went so far as to add that if seventeen people were with Mr. Diaz, "they would have been stopped."

In addition, the testimony at the hearing was inconclusive as to whether Perez was even with or accompanying Diaz at the time of the stop. Detective Peterson testified that he observed Perez standing near a telephone in the parking lot across from 295–305 Bennett Avenue. He was unable to recall if Perez was using the telephone and there is no evidence in this case that Perez carried a bag, made any furtive or suspicious movements or attempted to flee. Detective Peterson only saw Diaz and Sanchez walk over to Perez. From this description of the events in question, it is equally likely that Diaz and Sanchez were inquiring of Perez as to when he would be off the telephone as it is that Perez was an accomplice of Diaz engaged in criminal activity. There is simply no evidence in this record to support an objective finding of specific articulable facts that Perez was engaged in any criminal activity.

The record is also devoid of any evidence that the officers questioned Perez prior to approaching him with their guns drawn and ordering him to face a wall and spread his hands, a position he maintained for at least two minutes. In light of all of the above, the Court finds that the officers' intrusion into Perez's freedom was unreasonable.

Finally, there is also no evidence in the record that Perez in any way posed a danger to the officers. There is no evidence that Perez was carrying a bag or that any bulging objects indicative of a weapon were visible on his person. Nor is there any evidence that Perez made any sudden movements upon the appearance of the officers or that Perez attempted to flee. In this Court's view, Perez's mere proximity to Diaz and Sanchez is not, alone, evidence that a frisk of Perez was necessary for the officers' protection. As a result, the frisk of Perez subsequent to his stop was also unconstitutional. (*Terry*, 392 U.S. at 29, 88 S.Ct. at 1884; *Sibron*, 392 U.S. at 40, 88 S.Ct. at 1889)

The Government's contention that the stop and frisk of Perez was reasonable is without merit. First, the Government's statement of the governing law—that "[t]he standard governing the lawfulness of an investigatory stop is *simply* that 'the intrusion must be no greater than the circumstances require' " (Government Supplemental Memorandum at p. 7 [emphasis added] [citations omitted]), is incomplete. As the Second Circuit made clear in *Vasquez*, the governing standard is *both* a showing of specific articulable facts that warrant a reasonable suspicion of criminal activity *and* an analysis of the degree of intrusion into the individual's freedom. (*Vasquez*, 638 F.2d at 520)

Second, the Government argues that the stopping officers would have been "remiss" not to stop anyone who was "with" Diaz. (Government Supplemental Memorandum at p. 9) In support of this argument the Government cites to *United States v. Barlin*, 686 F.2d 81 (2d Cir.1982), a case in which one Fantauzzi was stopped and searched upon arriving at an apartment. In *Barlin*, the police were executing a search warrant in defendant Frank's apartment, and had already found heroin, handguns and ammunition when Frank, Fantauzzi and defendant Gleckler arrived. (*Barlin*, 686 F.2d at 87) The officers had specific information that Frank and Gleckler were narcotics dealers and that a major narcotics transaction involving them was under way. Fantauzzi, unknown to the officers, was frisked. Soon thereafter an

officer noticed her pocketbook between five and twenty feet from Fantauzzi. The pocketbook was searched, revealing $5,000 and one-half pound of nearly pure cocaine. (*Id.* at 86)

The Second Circuit in *Barlin* rejected Fantauzzi's claim that the police did not have a reasonable basis to stop and frisk her and to search her pocketbook, holding that:

> "[a]lthough Fantauzzi was unknown to the agents, we think her detention, the initial search of her person and the search of her pocketbook were reasonable and minimally intrusive.... *Fantauzzi was not innocuously present in a crowd at a public place.* Instead, she entered in tandem with Frank and Gleckler, whose involvement in an ongoing narcotics transaction seemed apparent. The agents did not have a realistic option of separating her from the others.... Search of Fantauzzi's purse was hardly gratuitous in these circumstances, since 'a lady's handbag is the most likely place for a woman to conceal a weapon.'" (*Id.* at p. 87) (emphasis supplied)

Unlike the factual situation in *Barlin,* where the "unknown" defendant entered into an apartment where there was probable cause to search for evidence of a narcotics transaction (and where such evidence had been found), the stop of Perez occurred in an outdoor parking lot next to a telephone booth after the person about whom the police had a reasonable suspicion—Diaz—approached Perez. Moreover, the officers' reasonable fear of danger was much greater in *Barlin,* where the defendants entered a confined area and where Fantauzzi carried a purse; in the instant case, the "five or more" agents could have stopped Diaz (and perhaps Sanchez) and questioned Perez without stopping him and without fear of danger, absent any action by Perez to the contrary. The Government contends that it was "readily apparent

from a search of the apartment that Adam Diaz and others were involved in narcotics trafficking" and that "[w]hile Perez was unknown to the DEA at the time, his arriving in tandem with Diaz at the building where Diaz maintained evidence of his drug dealing presents a situation much like that in *Barlin* ..." (Government Supplemental Memorandum at p. 10) As discussed above, however, there is no evidence in the record that Perez arrived "in tandem" with Diaz or that Perez approached, no less entered Diaz's apartment. Unlike in *Barlin,* in the instant case the stop of Perez was not reasonable or minimally intrusive.

As already stated, the Court finds that the illegal stop has tainted the officers' activities subsequent to the stop. As a result, the beeper, the money and the photograph of Perez must all be suppressed at trial.[7]

## CONCLUSION

For all of the reasons discussed above, Perez's motion to suppress the evidence seized from his person subsequent to his stop, as well as the evidence obtained as the fruit of that stop, is granted.

SO ORDERED.

---

7. The Government argues that even if the photograph of Perez is suppressed, "the Government still should not be precluded from presenting an in-court identification of the defendant by the victim and the witness since Perez himself is not a suppressible fruit of an illegal arrest."

(Government Supplemental Memorandum at p. 12) The Court agrees. (*See United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 [1980] [victim's in court identification of the accused is not fruit from poisonous tree of Fourth Amendment violation])